# United States Court of Appeals for the Federal Circuit

2006-1482


GRUMMAN AEROSPACE CORPORATION,

Appellant,

v.

Michael W. Wynne, SECRETARY OF THE AIR FORCE,

Appellee.


David H. Pittinsky, Ballard Spahr Andrews & Ingersoll, LLP, of Philadelphia, Pennsylvania, argued for appellant.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, and Bryant G. Snee, Assistant Director. Of counsel on the brief were Bryan R. O'Boyle, Air Force Legal Operations Agency, Arlington, Virginia, William M. Lackermann, Jr., and Donald M. Yenovkian, II, United States Air Force, Wright-Patterson Air Force Base, Ohio. Of counsel was Lauren S. Moore, United States Department of Justice.

Appealed from: Armed Services Board of Contract Appeals

Administrative Judge Jack Delman

# United States Court of Appeals for the Federal Circuit

2006-1482

GRUMMAN AEROSPACE CORPORATION,

Appellant,

v.

Michael W. Wynne, SECRETARY OF THE AIR FORCE,

Appellee.

_____

DECIDED:  August 17, 2007

_____

Before NEWMAN, RADER, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER.  Opinion dissenting in part filed by Circuit Judge NEWMAN.

RADER, Circuit Judge.

The Armed Services Board of Contract Appeals denied Grumman Aerospace Corporation's (Grumman's) superior knowledge claim against the United States Air Force (Air Force).  In re Grumman Aerospace Corp., 03-1, B.C.A. (CCH) ¶ 32,203 (A.S.B.C.A. March 14, 2003), aff'd on recon., 03-2 B.C.A. (CCH) ¶ 32,289 (A.S.B.C.A. June 23, 2003).  The Board also denied Grumman any damages under the jury verdict method on 14 of its sustained claims.  In re Grumman Aerospace Corp., 06-1, B.C.A. (CCH) ¶ 33,216 (A.S.B.C.A. February 27, 2006).  Because the Board correctly denied Grumman's superior knowledge claim and use of the jury verdict method for damages, this court affirms.

I

In the early 1980s, the Air Force sought to modernize the avionics (Avionics Modernization Program or AMP) for its fleet of F-111 aircraft. In 1984, the Air Force began this project by awarding General Dynamics Corporation (GDC) a contract to modernize the avionics of one model within the F-111 fleet, namely the FB-111A (FB-111A AMP). The Air Force also decided to offer another AMP contract for the F-111A/E and EF-111A models (F-111A/E AMP). The competition for the F-111A/E AMP ran concurrently with the on-going FB-111A AMP project. In re Grumman Aerospace Corp., 03-1, B.C.A. (CCH) ¶ 32,203 at 159,180 (A.S.B.C.A. March 14, 2003), aff'd on recon., 03-2 B.C.A. (CCH) ¶ 32,289 (A.S.B.C.A. June 23, 2003).

On June 1, 1984, the Air Force announced the F-111A/E AMP procurement in the Commerce Business Daily (CBD). In that announcement, the CBD advised potential offerors about the availability of data:

> Government will provide a library of available data. Additionally, required data for interface shall be the responsibility of the contractor via associate and subcontractor agreements. Previous performance of this task was by General Dynamics Fort Worth Division for the FB-111A aircraft. Data from that acquisition will not be available at time of proposal preparation or award. (emphasis added)

Id. After the CBD announcement but before release of the Request for Proposal (RFP), Grumman's F-111A/E AMP proposal manager attended two dinner meetings on the F-111A/E AMP procurement. At the first dinner meeting, Grumman's manager sought assurances about the fairness of the F-111A/E AMP procurement. At the second dinner meeting, the manager obtained general information about problems with the ongoing GDC FB-111A AMP contract. Id.

On January 31, 1985, the Air Force issued the F-111A/E AMP RFP. In the RFP, the Air Force identified the data for the preparation of proposals:

> L-637 COMPETITION DATA LIBRARY
> a. Data - An Avionics Modernization Program Competition Data Library has been established [sic] and is being maintained at SM-ALC [Sacramento—Air Logistics Center]. This library contains limited F-111 [sic] engineering and technical data, and will be maintained from RFP Release until contract award. The Competition Data Library (also referred to as "Data Library") will be provided to the successful offeror at contract award.
>
> b. This library contains the following categories of data:
> (1) FB-111A AMP data
> (2) F-111A/E and EF-111A engineering drawings
> (3) F-111A/E and EF-111A Aircraft Technical Orders
> (4) F-111A/E and EF-111A System (Commodity) Technical Orders
> (5) F-111A/E and EF-111A TCTOs
> (6) AMP Group B drawings and specifications
> (7) Computer program (software) specifications
> (8) Aircraft configuration status records
> (9) Other engineering/technical data required to define the aircraft or its system.
>
> c. This library will be complete, to the best of the Air Force's ability, at RFP Release. All data that is in the library will be available to all competing Contractors on an equal time, reservation basis. Data which is not available through the Data Library will not be provided by the Government to any Contractor. Any data added to the library after RFP release will be entered into a log including a description of the data, identification number and the date received. Every two weeks a copy of the log describing the new data will be provided to each of the bidders. New data will be considered additive; older revisions will be maintained throughout the period of operation of the library.

Id. Furthermore, the RFP included Clause H-1051, in pertinent part:

> H-1051 GOVERNMENT PROVIDED DATA - WARRANTY
> a. The Government in no way warrants the data contained in the AMP Data Library. The Government will not reimburse the Contractor for any cost incurred as a result of using data provided in the data library or allow a schedule slippage due to defects in the data provided.

Id. at 159,181. According to the record, Grumman fully understood that the Air Force gave no warranties about the data in the library.

2006-1482                                    3

In February 1985, Grumman circulated an internal memorandum to its proposal team. The internal memorandum also referred to Clause H-1051:

> Section H-1051 -The information obtained from the Data Library is not warranted due to the fact that the FB-111A design is not frozen. <u>This data is to be used at the bidders [sic] own risk.</u> (emphasis added)

Id.

On May 31, 1985, Grumman and GDC, the only two bidders, submitted their proposals for the F-111A/E AMP contract. Grumman's approach depended to some extent upon the use of the FB-111A Operational Flight Program (OFP) code and data under development for the ongoing GDC contract. Although the RFP directed each offeror to provide, as part of its proposal, a list of required Government Furnished Property (GFP), Grumman did not list any OFP software from the FB-111A concurrent contract. In other words, Grumman did not notify the Air Force that it expected to receive data from the GDC project.

After receipt of Grumman's proposal, the Air Force issued the following inquiry to Grumman:

> Para 5230.2 of the SOW [Statement of Work] refers to data for GFP to be used during development. Any such data required by the offeror must be identified as part of their proposal. Request you provide a list of any data to be provided by the Government which is in addition to that contained in the AMP Competition Data Library and the dates the data is required by.

Id. at 159,182. Thereafter, Grumman requested, inter alia, paper copies of FB-111A source code within 90 days of award. However, the Air Force replied to Grumman's request as follows: "The Government is reviewing that list. If the data is available, it will be provided. NOTE: Regardless of the availability of the data, the requirement of the RFP, SOW and SSS [System Segment Specification] will not be affected." Id.

Grumman and the Air Force met on August 26-27, 1985, about the pending initial proposal. During this meeting, the Air Force informed Grumman of possible significant mistakes in its proposal. The mistakes dealt with cost and pricing of engineering hours. On October 18, 1985, Grumman and General Dynamics each submitted a Best and Final Offer (BAFO) for the F-111A/E AMP contract. In December 1985, the Air Force awarded the contract to Grumman with an effective date of January 21, 1986. Under the contract, Grumman was to design, manufacture, and furnish kits to upgrade the avionics. Id.

In early February 1986, the Air Force conducted a post-award conference. During this conference, the Air Force informed Grumman about forthcoming data:

> 1. Data. The Government intends to be as helpful as possible in ensuring that adequate data is available. However, the RFP clearly stated that the data to be provided by the Government was limited to the contents of the Competition Library. Additional data must be obtained via the appropriate sub or associate contractors.

Id. at 159,183. Thereafter, the Air Force held a system design review from March 3 to March 7, 1986. At the review, Grumman indicated its concerns about receiving FB-111A common software from the GDC AMP contract. In response, the Air Force sent Grumman magnetic tape copies of the GDC AMP source code and specification information. However, in a letter accompanying the magnetic tape copies, the Air Force contracting officer cautioned Grumman that the Air Force did not warrant this information:

> The above data is being provided to Grumman as a supplement to the information required to accomplish contract tasks. It is Grumman's responsibility to evaluate this data and determine its applicability. The Government is not responsible for the accuracy of this data and under no circumstances should the data be interpreted as direction for the technical design. In particular, the software being provided is suitable for

familiarization purposes only; it contains numerous known errors. As soon as updated versions are available, they will be provided. It should be remembered that the source code baseline for the F-111A/E AMP consists of those OFPs that are in effect at the conclusion of FB-111A flight testing[.]

Id. at 159,184.

After the review session and this letter from the Air Force, Grumman submitted a computer program development plan for Air Force approval on April 24, 1986. This plan suggested that the contract obligated the Air Force to provide FB-111A data by a specific date. The Air Force sent a letter, dated June 9, 1986, to Grumman concerning this plan. The Air Force contracting officer disapproved Grumman's plan and denied any obligation to supply FB-111A data from the GDC concurrent contract:

> 3. On pages 13 (paragraph 3.1) and 16 (paragraph 3.2) of the CPDP, [Grumman] raised some issues that the Air Force is especially concerned about. [Grumman] impl[ies] that [its] ability to meet the F-11A/E [sic] Avionics Modernization Program (AMP) schedule is dependent on certain FB-111A AMP data. With respect to the Software Test Station (STS), this is true ....

> 4. The Operational Flight Program documentation is a different case. We have stated, consistently, that we will provide this documentation promptly and we have done so to date. However, there is no contractual obligation on our part to provide this data by certain dates, nor can we give you any assurances as to the accuracy of the data. Our inability to provide these documents may reduce your ability to maximize commonality with FB-111A software, but it is not justification for failure to meet the F-111A/E schedule.

Id.

Over the course of the contract, the Air Force and Grumman had numerous disputes. Then, on June 10, 1991, Grumman submitted a request for equitable adjustment. Specifically, Grumman sought recovery of unanticipated costs due to the inadequate provision of FB-111A OFP data. On August 26, 1993, the Air Force

contracting officer denied Grumman's request. The contracting officer determined that the Air Force had no contractual obligation to provide Grumman any FB-111A data beyond that in the AMP library. Thereafter, Grumman submitted a certified claim, dated March 30, 1994, for twenty-nine items valued at $65 million plus interest. Grumman calculated its damages request on a total cost method.

On September 30, 1994, the contracting officer issued a decision. The contracting officer granted some damages for a few claims, but denied liability under the total cost method. Grumman then appealed the contracting officer's decision to the Board. Id. Grumman's appeal to the Board included a superior knowledge claim and a claim for the use of the jury verdict method to calculate damages.

The Board denied fifteen of Grumman's twenty-nine claims and partially denied another six. In re Grumman Aerospace Corp., 03-1, B.C.A. (CCH) ¶ 32,203 (A.S.B.C.A. March 14, 2003), aff'd on recon., 03-2 B.C.A. (CCH) ¶ 32,289 at 159,260-61 (A.S.B.C.A. June 23, 2003). The Board concluded that Grumman did not show that the Air Force was liable for failure to disclose superior knowledge about the FB-111A AMP OFP data. Id. at 159,188.

On damages, Grumman claimed $65,612,862 plus interest. On July 24, 1996, the Board issued an order requesting additional proof on damages and costs. Grumman retained Ernst & Young LLP ("E&Y") to help respond to the Board's order. E&Y used the modified total cost method to calculate damages and arrived at a figure of $50,392,525 plus interest. In re Grumman Aerospace Corp., 06-1, B.C.A. (CCH) ¶ 33,216 at 164,607 (A.S.B.C.A. February 27, 2006). After the Board's determination that the Air Force was not fully responsible, Grumman provided a number of alternative

damage calculations. Under the modified total cost method, Grumman still sought from $22.7 million to $25.8 million. Id. at 164,610-11. The Board rejected this damages theory.

Alternatively, Grumman sought damages based on the jury verdict method for the fourteen claims sustained by the Board in In re Grumman Aerospace Corp., 03-1, B.C.A. (CCH) ¶ 32,203 (A.S.B.C.A. March 14, 2003), aff'd on recon., 03-2 B.C.A. (CCH) ¶ 32,289 (A.S.B.C.A. June 23, 2003). The Board, however, rejected the use of the jury verdict method for lack of sufficient evidence. In re Grumman Aerospace Corp., 06-1, B.C.A. (CCH) ¶ 33,216 at 164,621 (A.S.B.C.A. February 27, 2006). The Board instead awarded damages in the amount of $387,067 plus interest on six claims. Id. at 164,623. Grumman then appealed under 41 U.S.C. § 607(g)(1) and 28 U.S.C. § 1295(a)(10).

II

This court reviews the Board's conclusions of law without deference. Rex Sys., Inc. v. Cohen, 224 F.3d 1367, 1371 (Fed. Cir. 2000). Notwithstanding this lack of deference, this court carefully considers the Board's expertise in interpreting government contracts. Erickson Air Crane Co. v. United States, 731 F.2d 810, 814 (Fed. Cir. 1984) ("[L]egal interpretations by tribunals having expertise are helpful to us, even if not compelling."). As to questions of fact, if substantial evidence supports the Board's factual findings, this court will uphold them absent some indication that the decision "is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith." 41 U.S.C. § 609(b) (2000); see Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1428-29 (Fed. Cir. 1990) (citations omitted).

Superior Knowledge Claim

The Board extensively examined Grumman's superior knowledge claim under the four elements in Geisler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000):

(1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

Id.

First, the Board determined that "[t]he weight of the credible evidence shows that [Grumman] was generally aware of GDC's overall performance [with respect to the FB-111A AMP software and schedule]–or lack thereof–during the pre-award period." In re Grumman Aerospace Corp., 03-1, B.C.A. (CCH) ¶ 32,203 at 159,188 (A.S.B.C.A. March 14, 2003), aff'd on recon., 03-2 B.C.A. (CCH) ¶ 32,289 (A.S.B.C.A. June 23, 2003). Grumman and the Air Force had numerous meetings and exchanged numerous letters dealing with contract award and performance. For example, before the RFP release, Grumman's proposal manager attended meetings with an Air Force AMP official to discuss the F-111A/E AMP contract and general problems with GDC's FB-111A AMP contract. Moreover, Grumman had reasonable opportunities to obtain updates on GDC's FB-111A AMP contract, but did not specifically request information about that concurrent contract. In sum, Grumman did not act without vital knowledge but had reasonable notice of the problems with the GDC data.

The contract provisions do not mislead Grumman, but instead supported the Board's analysis. Specifically, the Board found that Grumman was on notice that the AMP data library, including the FB-111A AMP performance schedule, was not

warranted. Id. Moreover, those specifications were not "misleading regarding the timeliness of GDC's performance in general, or its design and testing of FB-111A Mission Control OFP data in particular." Id. In sum, the Board found:

> [T]he weight of the evidence shows the Air Force endeavored to provide OFP documentation from the ongoing [GDC] FB contract to [Grumman] for assistance if and when available, but did so without warranting the information or recognizing any contract obligation to do so.

Id. at 159,186. Thus Grumman did have vital knowledge or the opportunity to obtain that knowledge before contract entry. The contract did not mislead, but informed, Grumman of its obligations to obtain that knowledge. The Air Force did not withhold information to Grumman's deficit. Accordingly, this court finds that the Board properly applied the law and denied Grumman's superior knowledge claim.

Grumman challenges the substantiality of the evidence supporting the Board's determination. For instance, Grumman contends that its general awareness of the problems with GDC's FB-111 AMP contract performance did not suffice to supply it with necessary vital knowledge. To the contrary, the record shows that Grumman's proposal manager knew about problems with the GDC FB-111 AMP contract effort and also specifically knew that the Air Force repeatedly refused to warrant any data in the Competition Data Library. Grumman, an experienced defense contractor, entered into the contract "with its eyes open." See, e.g., Helene Curtis Indus., Inc. v. U.S., 312 F.2d 774, 778-79.

Grumman also contends that the Air Force had an obligation to disclose GDC's FB-111A AMP problems even if Grumman did not request this information. However, Grumman misinterprets the standard and sets the bar too high. The Air Force did not have an affirmative duty to provide GDC's contract performance status to Grumman,

especially when Grumman did not request this information. <u>Am. Ship Bldg. v. United States</u>, 654 F.2d 75, 79 (Ct. Cl. 1981).

Finally, Grumman alleges that the Air Force knowingly withheld contradictory information in the AMP Data Library, thereby causing Grumman to submit a low bid. However, the Air Force, on numerous occasions, indicated the unwarranted nature of the data and its plan to keep the two contracts separate. Furthermore, the Air Force specifically informed Grumman of its concern about a possible mistake in Grumman's engineering hours before Grumman's BAFO submission. In sum, substantial evidence supports the Board's decision.

### Jury Verdict Award

The Board rejected Grumman's jury verdict method for damages on the fourteen claims sustained by the Board. "The jury verdict method is designed to produce an approximation of damages based on the entire record." <u>Raytheon Co. v. White</u>, 305 F.3d 1354, 1367 (Fed. Cir. 2002). In order to adopt the jury verdict method, "[the Board] must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." <u>Dawco Constr., Inc. v. United States</u>, 930 F.2d 872, 880 (Fed. Cir. 1991). This court makes clear, however, that the jury verdict method may only be used when other, more exact, methods do not apply. <u>Id.</u>

In this case, the Board concluded that Grumman generally showed proof of injury on the sustained claims. The Board also sustained Grumman's reasonable reluctance to segregate each of its claims and prove the actual costs for each one. However, the

Board concluded that this case did not warrant a mere approximation of the damages. In re Grumman Aerospace Corp., 06-1, B.C.A. (CCH) ¶ 33,216 at 164,621 (A.S.B.C.A. February 27, 2006). Because the Board's conclusion about the sufficiency of the evidence is factual, this court will uphold the Board's conclusion absent some indication that the conclusion "is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith." 41 U.S.C. § 609(b); Fruin-Colon Corp., 912 F.2d at 1428-29.

In its thirty-six page opinion on damages, the Board analyzed and reviewed cost information from Grumman, E&Y, and the Air Force. The Board also reviewed the Source Selection Evaluation Board's report on the proposed engineering hours from both bidders as well as the government estimate. In re Grumman Aerospace Corp., 06-1, B.C.A. (CCH) ¶ 33,216 at 164,608 (A.S.B.C.A. February 27, 2006). Based on the record, the Board found that the E&Y actual costs were not reasonable. Id. at 164,609. Specifically, Grumman "offered no testimony and offered no documentary evidence related to the use of any of these quantifications, or any of the estimates or percent figures upon which the quantifications were based." Id. at 164,612. After reviewing the cost estimates from Grumman and the Air Force, the Board found adequate evidence for six of the sustained claims and awarded Grumman $387,067.00 plus interest.

This court observes no abuse of discretion in the Board's findings about the lack of evidence to support a jury verdict. The Board reviewed over numerous documents and hundreds of pages of cost information as well as a great deal of testimony. For example, the record does not show any evidence to make a fair and reasonable approximation of Grumman's damages with respect to the development of a Kalman

filter for the F-111A/E AMP effort. The Kalman filter record points to 8,217 man-hours expended as shown by an internal memorandum from a Grumman project software engineer. However, the memorandum did not distinguish between work within the scope of the contract and outside the needs of the contract. The subject line of the memorandum referred to underestimating tasks. As such, the Board decided that this evidence did not support a reasonable approximation of damages because Grumman's poor bidding judgment might have actually caused a part of these 8,217 man-hours. Id. at 164,619.

Further, Grumman mistakenly attempted to rely on the cost figures in the contracting officer's review of Grumman's request for equitable adjustment. However, the CO's figures do not include any supporting cost data for the Board's independent review. Also, when Grumman modified its request, the CO withdrew acknowledgement of any specified damages. In any event, the Air Force did not admit liability based on the CO's cost findings. Id. at 164,622. Because Grumman has the burden to prove damages as a result of Air Force actions, the Board correctly determined that the CO's figures did not support an equitable adjustment.

Last, and most important, the Board found that Grumman's damage figures relied entirely upon the E&Y report rather than on its actual costs. E&Y did not prepare the report by using an independent evaluation of the reasonableness of Grumman costs but instead relied solely on the Source Selection Advisory Council (SSAC) analysis report. However, this report, by its own terms, simply set forth acceptable parameters, rather than a calculation of actual costs. Id. at 164,607-08. Moreover, Grumman could not substantiate many of the figures in the SSAC analysis because it had prematurely

destroyed important project documents.  In re Grumman Aerospace Corp., 03-1, B.C.A. (CCH) ¶ 32,203 at 159,261 (A.S.B.C.A. March 14, 2003), aff'd on recon., 03-2 B.C.A. (CCH) ¶ 32,289 (A.S.B.C.A. June 23, 2003).  The Board justifiably discounted some of Grumman's proofs due to its premature destruction of contract records.  In sum, the record, as the Board found, did not support a fair and reasonable approximation of damages.  Therefore, the Board did not abuse its discretion in denying Grumman's jury verdict method claim.

III

In conclusion, this court affirms the Board's decision to deny Grumman's superior knowledge claim and Grumman's use of the jury verdict method to calculate damages.

AFFIRMED

COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

2006-1482

GRUMMAN AEROSPACE CORPORATION,

Appellant,

v.

Michael W. Wynne, SECRETARY OF THE AIR FORCE,

Appellee.

NEWMAN, Circuit Judge, dissenting in part.

As the Armed Services Board of contract Appeals determined, there were serious flaws in the bidding and thus in the performance of this contract. Whether Grumman actually knew that the information that it states it expected from the Air Force was not available or was seriously inadequate is far from clear, but a discrepancy of $100 million between the bids of the incumbent Lockheed (who knew of the flaws and inadequacies) and the competitor Grumman is so extreme that some flaw in the bidding information should be considered, for it is clear that the Air Force had knowledge based on which it could not have expected adequate performance at the bid price. Government procurement is not a game of "gotcha." The likely impossibility of performance should have been communicated before, not after, the contract was awarded and performance was undertaken.

The Board indeed found that significant additional costs were incurred due to the state of the project as Grumman received it. That is, whatever the reason for the inadequate communication of the nature of the information that would be available to Grumman after award, the Board found that much more work was reasonably required. Further, the Board found that Grumman was entitled to compensation for at least some of this work, and denied compensation only because of the difficulty of measuring precisely what costs were due to precisely what aspects. It is not disputed that these measurement difficulties existed. This is a classic example of the procedure that has come to be called the "jury-verdict" method of measuring performance costs in government contracts. See, e.g., Bluebonnet Savings Bank, F.S.B. v. U.S., 466 F.3d 1349, 1359 (Fed. Cir. 2006) ("jury verdict damages are allowed where there is 'clear proof of injury and . . . no more reliable method for computing damages.'"); Raytheon Co. v. White, 305 F.3d 1354 (Fed. Cir. 2002):

> The jury verdict method is designed to produce an approximation of damages based on the entire record. Before resorting to the jury verdict method, a court (or Board) must determine (1) that clear proof of injury exists; (2) that there is no more reliable method for calculating damages; and (3) that the evidence is sufficient to make a fair and reasonable approximation of the damages.

Id. at 1367 (citing WRB Corporation v. United States, 183 Ct. Cl. 409, 425 (1968)). This method should have been applied here, with the Board making its best estimate of a fair and just award based on the best available information. It is neither fair nor just to deny compensation simply because it is hard to measure. From the court's acceptance and endorsement of this denial, I respectfully dissent.

2006-1482                                    2