# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Tug Hill Construction, Inc. | ) ASBCA No. 57825 |
| | ) |
| Under Contract No. W9126G-09-D-0006 | ) |

APPEARANCE FOR THE APPELLANT:    Brian R. Dugdale, Esq.
    Varela, Lee, Metz & Guarino
    McLean, VA

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
    Engineer Chief Trial Attorney
    Charles L. Webster III, Esq.
    Cindy E. Shimokusa, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Fort Worth

## OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

The government entered into a firm, fixed-price contract with appellant for construction work at Fort Bliss, Texas. Appellant seeks additional compensation for utility system work in excess of its original price. The Board conducted an eight-day hearing, on the issue of entitlement only. The Board finds that appellant is not entitled to additional compensation, and denies the appeal.

## FINDINGS OF FACT

1. On 9 April 2010, a Request for Proposals (RFP) was issued by the U.S. Army Corps of Engineers (government or USACE) for Phases 3 and 4 of the Fort Bliss Combat Aviation Brigade Additional Infrastructure Project (CAB 3 & 4) to the five contractors in the government's Fort Bliss infrastructure multiple award task order contract (MATOC) (R4, tab 3). The proposed task order was to be awarded on a firm fixed-price basis to the lowest priced acceptable offeror (R4, tab 4).

2. The scope of work for the project included the demolition of certain sections of existing utility systems and the construction of new primary electric, water, sanitary sewer, communications, and natural gas utilities systems. The new utilities would subsequently be connected back to the existing main utility systems. (R4, tab 3 at 55-57, 99) Further, the delivery order provides:

SPECIAL NOTICE:
The existing Fort Bliss Main Post Utility Systems are
privately owned. This scope of work includes coordinating
project utility requirements with the owners of the
privatized utility systems. Typically Utility owners will
remove existing utilities, install new primary utility
systems and make final connections between the new
systems and existing. However, contractors shall be
responsible for negotiating and finalizing utility system
work with the utility providers. The Contractor will
include its cost for such work in its cost proposal.

(R4, tab 4 at 40) We find that the language of the Special Notice is unambiguous, and put offerors on notice that they were to make arrangements, or at least conduct discussions with, the utility providers, and account for whatever resulted from those arrangements or discussions in their cost proposals.

3. Three offerors submitted proposals for the delivery order: appellant, J.D. Abrams, and Sundt Construction (Sundt) (R4, tab 29; tr. 7/148, 8/118).

4. The Fort Bliss water utility provider was Fort Bliss Water Services Company (FBWS), the electric utility provider was Rio Grande Electric Cooperative, Inc. (RGEC), and the gas utility provider was Texas Gas (tr. 7/130). FBWS and RGEC became the owners of the Fort Bliss utility systems through a privatization effort that resulted in the utility providers entering into 50-year contracts with the Army. Thus, the Army gave these two utility owners service contracts that obligate them to operate and maintain their respective systems and to provide utility services to Fort Bliss. (R4, tabs 15, 16). We find that these contracts allow the utility owners to act as autonomous entities with respect to their respective utilities on Fort Bliss.

5. Appellant was aware of the Special Notice as early as 11 May 2010, prior to submitting its proposal (supp. R4, tab 137; tr. 1/71, 171-73). On that date, in addition to extending the proposal submission deadline to 24 May 2010 at 2:00 pm, the government amended the RFP to add the Special Notice to the Scope of Work (supp. R4, tabs 38-41).

6. On 19 May 2010, appellant received word from a company named CF Jordan that, with respect to CAB 3 & 4, "[FBWS] is going to be doing the water/sewer" (supp. R4, tab 148 at 827).

2

7. On 19 May 2010, Sundt posted the following (Inquiry No. 3276130) on the government's "ProjNet"[1] system, with respect to CAB 3 & 4:

> Please clarify the Special Notice regarding coordination and negotiations with the owners of privatized utilities. Based upon the language provided, bidders should include in their cost proposal: Costs of work typically performed by the utility owners. Fees charged by the utility owner, such as design review, connection, and inspections. Costs for all other work required to conform with the contract documents. Are these assumptions correct? Finally, should the contractor assume, depending on the utility owner, the contractor may be required to sub-contract directly with the utility owner in order to complete the work?

(Supp. R4, tab 45 at 77)

8. Prior to submitting their cost proposals, Sundt and J.D. Abrams contacted FBWS and RGEC. RGEC would not provide a price quote for the delivery order electrical utility system work, but, on 20 May 2010, FBWS provided a quote of $11,071,000 to Sundt and J.D. Abrams for the water utility system work. (Supp. R4, tabs 146, 151; tr. 7/144-48, 8/117-20).

9. Also on 20 May 2010, a company named Helix Electric, Inc. (Helix), passed along to appellant a message that Helix had received from RGEC regarding CAB 3 & 4, in which RGEC stated:

> We are the owners of the Ft. Bliss power distribution system. Please ask your general contracting POC or your USACE POC to contact us about the work required for CAB phases 3 & 4.

(Supp. R4, tab 144 at 819) On the same day appellant contacted RGEC, and asked, with respect to CAB 3 & 4, "[c]an you explain the work to be completed on this project by the...contractor and what role [RGEC] will play in the project please" (supp. R4, tab 150 at 832). The purpose of appellant's question was to seek clarification "as

---

[1] The ProjNet inquiry system is a public electronic bulletin board where offerors may ask the USACE for clarification on a solicitation (*see* tr. 1/126). It allows offerors to view all previously-submitted inquiries, and responses, and to add new inquiries (R4, tab 3 at 75).

3

to what [appellant's] role was going to be and what [RGEC's] role was going to be" (tr. 1/121). On 21 May 2010, RGEC replied:

> RGEC's typical role involves anything with the electrical utility system. We are responsible for all of the demolition of existing and installation of new distribution utilities.... We have yet to receive clear plans so I am unable to fully comment on the work to be completed on the project. If this doesn't answer your question, please let me know and I can try to provide you with better information.

(Supp. R4, tab 150 at 831)

10. On 21 May 2010, Sundt posted the following (Inquiry No. 3283285) on ProjNet, with respect to CAB 3 & 4:

> [RGEC] has informed the General Contractors that they will not be providing pricing for at least (3) three weeks. In addition, [RGEC] is not going to approve the existing design. [FBWS] has only provided conceptual budgetary numbers that are not contractually binding. [FBWS] says that firm pricing will be available in the next month. [FBWS], Texas Gas, and [RGEC] are not going to allow the...contractors to self-perform the work.... Given that we are not going to receive pricing, we are requesting a suitable time extension for the privatized utility contractors to provide firm price quotations.

(Supp. R4, tab 45 at 77-78)

11. The government did not respond to Inquiry Nos. 3276130 and 3283285 (supp. R4, tab 45 at 77-78).

12. On the morning of 22 May 2010, Steve Haskins, appellant's estimating manager and purchasing manager (tr. 1/58), emailed Jeffrey Kellogg, appellant's president and sole owner (tr. 1/147), bringing to Mr. Kellogg's attention Inquiry No. 3283285, which was included in an attachment to that email (supp. R4, tab 155 at 837, 843-44). The attachment also contained Inquiry No. 3276130 (supp. R4, tab 155 at 843-44). That evening, Mr. Haskins raised with Mr. Kellogg the issue of "risks" with respect to CAB 3 & 4, including "impacts of Special Note," and "Attorney fees to carry, if any" (supp. R4, tab 156 at 845).

4

13. On the morning of 24 May 2010, at 10:02 am, appellant was told by a company named SBC Global that it had learned that, with respect to CAB 3 & 4, "[RGEC] will not let anyone do their work on this project," "[RGEC] does not like the [government's] design and intends to redesign the project," and "[RGEC] will not have a price for this for 3 to 4 weeks." SBC Global also told appellant:

> With this as it is please proceed as you see fit with the bid I sent you. It would be bad if the cost I gave you is less than [RGEC] quotes and someone gets stuck."

(Supp. R4, tab 157 at 846)

14. On 24 May 2010, at 1:43 pm, appellant submitted its proposal (supp. R4, tab 159 at 850).

15. We find that appellant did not seek price quotes from FBWS or RGEC before submitting its proposal, and moreover, never contacted FBWS regarding CAB 3 & 4 before submitting that proposal (tr. 1/132-33, 2/76).

16. On 16 June 2010, USACE awarded Delivery Order No. 0006, pursuant to Contract No. W9126G-09-D-0006, to appellant for the fixed price sum of $28,024,550 (R4, tab 4 at 1, 4).

17. On 24 August 2010, appellant informed the government that it had received pricing from RGEC and FBWS that was higher than the pricing that appellant had included in its proposal (app. supp. R4, tab 292 at 586). Appellant requested that the government "direct the Utility Providers to provide competitive pricing" (*id.* at 587).

18. On 2 September 2010, the contracting officer (CO) informed appellant by letter that appellant's "sole remedy is to continue negotiating with the utility providers until a reasonable price is obtained" (app. supp. R4, tab 295 at 2).

19. On 9 September 2010, John Moreno, the government's deputy program manager, stated in a meeting the day before with RGEC and FBWS (and others, but not appellant) that, with respect to CAB 3 & 4:

> [I]t was clear in the amendment that was put out to their contractors that they were supposed to coordinate with the [utility providers] for pricing and if they did not do that this was now their problem.

(Tr. 5/74, 93-95; app. supp. R4, tab 301 at 141-42, ¶ 7)

20. By letter dated 24 September 2010, FBWS informed appellant that its revised pricing was its final position. FBWS added:

> Per COE Amendment 2, the MATOC contractors were to have contacted the Utility providers, (FBWS for water and waste water) for pricing, prior to bid submission. Although other MATOC contractors made contact with FBWS, [appellant] did not. Had [appellant] followed the instructions in Amendment 2, FBWS strongly feels this pricing issue could have been avoided.

(Supp. R4, tab 192)

21. In November 2010, appellant entered into a service agreement with FBWS, agreeing to pay $11,726,123 for water utility system work at Fort Bliss (supp. R4, tab 210).

22. In January 2011, appellant entered into a service agreement with RGEC, agreeing to pay $8,821,602.99 for electric utility system work at Fort Bliss (supp. R4, tab 223).

23. In March 2011, appellant presented a certified claim to the CO for $11,357,528.20 (R4, tab 26 at 30). Appellant claimed that its cost proposal had included $5,867,800 for FBWS's scope of work, and $5,973,050 for RGEC's scope of work (*id.* at 3). Appellant asserted that the government had breached the implied covenant of good faith and fair dealing, including by not helping appellant negotiate with FBWS and RGEC (R4, tab 26).

24. On 31 October 2011, the CO issued a final decision denying appellant's certified claim (R4, tab 2).

25. Appellant timely filed this appeal on 2 November 2011.

## DECISION

*The Implied Covenant of Good Faith and Fair Dealing*

Appellant contends that the government breached the implied covenant of good faith and fair dealing after the award by not helping appellant negotiate with the utility providers after appellant was awarded the delivery order. We reject that contention. The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract. *Metcalf Construction Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that,

6

though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. *Id.* Pursuant to the Special Notice, the government hired appellant to coordinate, negotiate, and finalize the utility systems work with the utility providers (finding 2); the implied duty of good faith and fair dealing did not require the government to help appellant perform that work, or to help appellant obtain lower prices from the utility providers. Not helping appellant negotiate with the utility providers was not inconsistent with the delivery order's purpose and did not deprive appellant of the contemplated value of the delivery order; the delivery order nowhere implies that the government was required to intervene in the negotiations, and did not deprive appellant of any of the contemplated value of the delivery order.[2] *Cf. Bell/Heery v. United States*, 739 F.3d 1324, 1331-35 (Fed. Cir. 2014) (allegations that government failed to engage state agency regarding contractor's excavation permit application did not state a claim of breach of the implied covenant of good faith and fair dealing where contract provided that "[t]he Contractor shall, *without additional expense to the Government,* be responsible for obtaining any necessary licenses and permits"). To the contrary, appellant agreed to a fixed price for a scope of work that included negotiating with the utility providers; whether that price covered the eventual cost of the scope of work was appellant's risk.

On this point the Special Notice is unambiguous: the scope of work "include[d] coordinating project utility requirements with the owners of the privatized utility systems," that "contractors shall be responsible for negotiating and finalizing utility system work with the utility providers," and that "[t]he Contractor will include its cost for such work in its cost proposal" (finding 2). Appellant agreed to perform the delivery order work for the fixed price of $28,024,550 (finding 16) without having first negotiated the work with the utility providers (finding 15); consequently, appellant, not the government, assumed the risk that the work would cost more than appellant anticipated when it submitted its proposal. *See Spindler Constr. Corp.,* ASBCA No. 55007, 06-2 BCA ¶ 33,376 at 165,462-63. Therefore, although appellant contends that FBWS and RGEC[3] charged more than appellant anticipated for utility system work, and that the process of coordinating, negotiating, and finalizing agreements with the utility providers otherwise increased its costs, appellant bore that risk when it submitted its proposal.

---

[2] Appellant does not appear to rely upon the 9 September 2010 statement made by John Moreno, the government's deputy program director, during a meeting with the utility providers (finding 19). In any event, we find that Mr. Moreno's statement did not breach the implied duty of good faith and fair dealing. That statement merely reflected the government's view, consistent with the unambiguous language of the Special Notice (finding 2), that appellant was responsible for coordinating and negotiating utility systems work with the utility providers.

[3] Appellant raises no issue with respect to Texas Gas.

7

Appellant contends that the government breached the implied duty of good faith and fair dealing because, appellant contends, the government controlled the utility providers through other contracts, but did not exert that control to help appellant negotiate with the utility providers. A contractor does not assume the risk of interference with its performance by the government's other contractors who are also under the control of the government. *See Toombs & Co., Inc.*, ASBCA No. 34590 *et al.*, 91-1 BCA ¶ 23,403 at 117,423 (government's failure to assure timely performance of its asbestos contractor breached duty to cooperate with construction contractor whose performance was delayed). However, in this matter, appellant does not demonstrate that the government possessed rights pursuant to contracts with the utility providers that it failed to exercise to address the utility provider's conduct. In this respect this appeal is different from *American International Constructors, Inc.*, ENG BCA Nos. 3633, 3667, 77-2 BCA ¶ 12,606, upon which appellant heavily relies. There, the government entered into a contract with a construction company that required the construction company to use a particular shipper with which the government also had a contract. *Id.* at 61,098. The shipper delayed performance, delaying the construction contractor's performance. *Id.* at 61,103. That Board held that the government breached the implied duty of good faith and fair dealing by failing to exercise its rights under its contract with the shipper to assist the construction contractor in its problems with the shipper. *Id.* at 61,106-07. However, the Board relied for that holding upon specific provisions of the government's shipping contract, including a provision that would have allowed for the use of vessels not owned by the shipping contractor in the event of the shipper's failure to perform. *Id.*[4] Here, appellant does not point to any provision of any contract between the government and RGEC or FBWS to support its contention that the government possessed control arising from its contracts with the utility providers that the government failed to exercise.

Appellant further contends that the government's alleged breaches of the implied covenant of good faith and fair dealing include policy, program, and contract formation actions that the government took before awarding the delivery order. We reject that contention as well. The government could not have breached the covenant of good faith and fair dealing by its pre-award conduct because the covenant did not exist until the contract (that is, the contract at issue in this matter, Delivery Order No. 0006) was signed. *See Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012); *see also CAE USA, Inc.*, ASBCA No. 58006, 13 BCA ¶ 35,323 at 173,390 (rejecting allegations of breach of the implied covenant based solely on pre-award conduct). Although every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, that duty does not deal with good faith in the formation of a contract. *Scott Timber*, 692 F.3d at 1372 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)).

---

[4] In any event, decisions of other Boards are not binding on this Board.

To be sure, pre-contract actions by the government can bear on the question of whether the government has complied with its obligations that are eventually imposed by the contract. *Id.* For example, if the contract obligates the government to take action within a reasonable period, delays by the government even before contract signing may bear on the reasonableness of delays during the period that the contract is in force. *Id.* However, this is not such a case. The contract did not obligate the government to help appellant negotiate with the utility providers; therefore, none of the pre-contract events that resulted in the contract assigning that obligation to appellant are relevant to whether the government breached the contract. Nor is this a case in which parties' pre-controversy actions are relevant in determining what the parties intended by agreeing to contract language whose precise meaning is not clear. *See Metcalf Construction*, 742 F.3d at 997. Here, the Special Notice is clear and unambiguous: it assigned to appellant the responsibility to negotiate with the utility providers (finding 2).

Appellant appears to suggest that the government was obligated to have taken the utility providers' property (app. reply at 32-33, 37). If so, we reject that suggestion. Of course, the government possesses the power, as sovereign, to take private property. *See El-Shifa Pharmaceutical Indus. Co. v. United States,* 378 F.3d 1346, 1356 (Fed. Cir. 2004). However, an act or omission of the government as sovereign is not itself a breach of a government contract; for a sovereign act or omission to result in a contract breach, the contract must have promised that the sovereign act would not occur, or that it would occur and did not. *See Connor Bros. Constr. Co. v. United States*, 550 F.3d 1368, 1371-72, 1374-75 (Fed. Cir. 2008). Here, appellant points to no provision of the delivery order that provides that the government would exercise its sovereign power to take the utility providers' property.

*Superior Knowledge*

Appellant contends that before awarding the delivery order, the government withheld knowledge that the utility providers took the position that only they could perform Fort Bliss utility system work, and that the utility providers could not estimate the cost of such work, or would charge a premium for that work. To the extent that appellant asserts a "superior knowledge" claim, that claim fails. The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor *otherwise unavailable information* regarding some novel matter affecting the contract that is vital to its performance. *Scott Timber*, 692 F.3d at 1372. However, where a contractor has the opportunity before contract entry to obtain the knowledge that the government has, the government's knowledge is not superior. *See Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007).

Here, the information that appellant contends the government withheld was otherwise available; indeed, before submitting its proposal, appellant learned much of that information. Appellant learned from RGEC that "RGEC's typical role involve[d] anything with the electrical utility system," that RGEC was "responsible for all of the demolition of existing and installation of new distribution utilities," and that RGEC was "unable to fully comment on the work to be completed on the project" (finding 9). Appellant read in Inquiry No. 3283285 that pricing from RGEC and FBWS was not available, and that RGEC and FBWS were not going to allow contractors to self-perform (findings 10, 13). Appellant had Inquiry No. 3276130, which raised the issue whether "the contractor [should] assume, depending on the utility owner, [that] the contractor may be required to sub-contract directly with the utility owner in order to complete the work" (finding 7). And only hours before submitting its proposal, appellant heard from SBC Global that "[RGEC] will not let anyone do their work," and that the cost proposal that appellant had received from SBC Global for electrical utility system work might end up being less than what RGEC would charge (finding 13). With and despite that knowledge, appellant submitted its proposal, evidently having decided that the "risks" that appellant's estimator had raised with appellant's owner two days earlier were worth taking (findings 13, 14).

In addition, information regarding what FBWS might charge for water utility system work was available before appellant submitted its proposal, from FBWS. Had appellant contacted FBWS before submitting its proposal, it might have received (as did J.D. Abrams and Sundt) an $11,071,000 estimate for the water utility system work (finding 8), an amount in the same range as the eventual $11,726,123 that FBWS ultimately charged appellant for that work (finding 21).

*Constructive Change*

Appellant contends that the government constructively changed the delivery order by requiring appellant to contract with the utility providers (as opposed to allowing appellant to perform the utility system work itself), inconsistent with the delivery order's provisions.[5] To demonstrate a constructive change, appellant must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government. *Bell/Heery*,

---

[5] The Board allows the post-hearing amendment to appellant's complaint, and finds jurisdiction to entertain appellant's "constructive change" argument. Although appellant did not present that theory in its claim to the CO, it bases that theory upon the same operative facts that it presented to the CO. *ACE Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007). Those facts included that, on 2 September 2010, the government sent appellant the letter in which the CO stated that appellant's "sole remedy is to continue negotiating with the utility providers until a reasonable price is obtained" (R4, tab 26 at 7 & ex. 6).

10

739 F.3d at 1335. Appellant does not meet that test. Appellant does not demonstrate that interacting with the utility providers was performance of work beyond the requirements of the delivery order (or that the utility providers performed any "additional work"). After all, pursuant to the Special Notice, appellant's scope of work expressly *included* "coordinating project utility requirements with the owners of the privatized utility systems," and "negotiating and finalizing utility system work with the utility providers" (finding 2). That means that however the utility systems work was to be accomplished, coordination, negotiation, and finalization of that work with the utility providers would be required; contrary to any suggestion by appellant that it could perform the utility system work without involving the utility providers at some stage (even if only to negotiate with the utility providers that appellant would "self-perform").[6] Indeed, appellant ultimately performed the coordination, negotiation, and finalization with the utility providers that produced the service agreements—albeit several months after award (findings 21-22).

Moreover, appellant does not demonstrate that the government dictated any term of either service agreement, much less that any such term is "additional" to the delivery order. In that regard, appellant does not demonstrate that the government mandated that it hire the utility providers to perform the utility systems work; the CO's 2 September 2010 statement that appellant's "sole remedy [was] to continue negotiating with the utility providers until a reasonable price is obtained" (finding 18) was in response to appellant's request for help with the utility providers' pricing (finding 17), and was consistent with the Special Notice's provision that "contractors shall be responsible for negotiating and finalizing utility system work with the utility providers" (finding 2). Because the delivery order also provided that "[t]he Contractor will include its cost for such work in its cost proposal" (finding 2), appellant bore the risk of the cost of that work.

It is always more difficult to negotiate after the fact when, as in this case, appellant was clearly put on notice to coordinate with the utility providers prior to bid submittal (finding 2). Here, appellant did not (finding 15), and must bear the cost of its decision. For these reasons, appellant is not entitled to any additional compensation for utility system work.

---

[6] At least as late as 20 May 2010, appellant appeared to take the position that the utility providers *would* be involved in the accomplishment of the utility system work. On that date, appellant contacted RGEC for clarification "as to what [appellant's] role was going to be and what [RGEC's] role was going to be" (finding 9).

11

## CONCLUSION

Accordingly, the appeal is denied.

Dated: 16 October 2014

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57825, Appeal of Tug Hill Construction, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

12