# United States Court of Appeals for the Federal Circuit

———————————

**SCOTT TIMBER COMPANY,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

———————————

2011-5092

———————————

Appeal from the United States Court of Federal Claims in case no. 05-CV-708, Judge Charles F. Lettow.

———————————

Decided: September 5, 2012

———————————

ALAN I. SALTMAN, Smith, Currie & Hancock LLP of Washington, DC, argued for plaintiff-appellee. With him on the brief was RUTH G. TIGER. Of counsel on the brief was JAMES J. WHITE, of Ann Arbor, Michigan.

ELLEN M. LYNCH, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRYANT G. SNEE, Deputy Director.

———————————

Before LOURIE, DYK, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK. Dissenting opinion filed by *Circuit Judge* WALLACH.

DYK, *Circuit Judge.*

The United States appeals from a judgment of the Court of Federal Claims ("Claims Court") finding that the government breached three timber-harvesting contracts and awarding damages to Scott Timber Company ("Scott"). *See Scott Timber Co. v. United States* ("*Damages Decision*"), 97 Fed. Cl. 685 (2011); *Scott Timber Co. v. United States* ("*Liability Decision*"), 86 Fed. Cl. 102 (2009). We reverse.

BACKGROUND

I

This is another in a series of cases involving allegations that the government breached contracts for the sale of timber on public lands. Timber-harvesting contracts, such as those at issue here, allow the contract holder to cut and remove a specified volume of timber from designated federally-owned lands during a designated period of time. Here, the United States Forest Service held oral auctions in October 1998 for the sale of timber on plots of land in the Umpqua National Forest in the Pacific Northwest, including plots named Pigout, Jigsaw, and Whitebird. At the time, Scott was pursuing litigation against the government based on delays in other contracts resulting from environmental litigation. *See Scott Timber Co. v. United States* ("*Scott I*"), 333 F.3d 1358, 1362 (Fed. Cir. 2003) (action initiated on October 27, 1994). Before the October 1998 auctions for the Pigout, Jigsaw, and Whitebird plots, the Forest Service read a notice telling "prospective bidders that the sale is currently under [environmental] litigation and award may be delayed."

J.A. 207. The Forest Service awarded the timber contracts for Pigout, Jigsaw, and Whitebird to Scott on July 8, 1999. Curiously, the initial harvesting period for each of the contracts is not clear from the record, but the period apparently spanned the time from 2000 to 2003.

Because of the risk posed by potential environmental litigation, and by litigation against the government for the resulting delays, the government included provisions in the timber-harvesting contracts involved here authorizing the Forest Service to suspend the awarded contracts in order to comply, for example, with a court order enjoining harvesting on the involved lands. The suspension provision in each of the Pigout, Jigsaw, and Whitebird contracts provided in relevant part:

> CT6.01 – INTERRUPTION OR DELAY OF OPERATIONS. . . . Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
>> (a) To *prevent serious environmental degradation or resource damage* that may require contract modification under CT8.3 or termination pursuant to CT8.2;
>>
>> (b) To comply with a court order, issued by a court of competent jurisdiction; or
>>
>> (c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).
>
> Purchaser agrees that in the event of interruption or delay of operations under this provision, that

> its sole and exclusive remedy shall be: (i) Contract Term Adjustment pursuant to BT8.21 . . . plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser . . . .

J.A. 67-68, 85, 103 (emphases added). In the event of a suspension delaying the performance, the contract provided for a term adjustment "to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost." J.A. 62, 79, 97 (Provision BT8.21 Contract Term Adjustment). However, the suspension clause specifically prohibited the award of "lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered" by Scott as the result of an authorized suspension. J.A. 67, 85, 103.

At the time of the award, Oregon Natural Resources Council Action ("Oregon Natural") had brought suit against the government claiming that the Forest Service "ha[d] violated the Northwest Forest Plan adopted in 1994, and hence ha[d] violated applicable statutes, by authorizing timber sales without first conducting surveys for certain species of wildlife." *Oregon Natural Res. Council Action v. U.S. Forest Serv.*, 59 F. Supp. 2d 1085, 1087 (W.D. Wash. 1999). The Plan required that surveys of certain species of wildlife "must be completed prior to ground disturbing activities that will be implemented" after a specified cut-off date. J.A. 179. The Plan encompassed the area including the Pigout, Jigsaw, and Whitebird plots. Oregon Natural's July 1998 complaint did not identify any particular timber sales. However, the complaint challenged the validity of the Forest Service's interpretation of the Northwest Forest Plan that ex-

empted various timber sales in the Pacific Northwest, including those in dispute here, from the Plan's survey requirements. *Oregon Natural*, 59 F. Supp. 2d at 1087-88. The suit was a matter of public record.

On July 26, 1999, following a hearing, and after the award of the contracts in question, the *Oregon Natural* court issued a preliminary injunction against further operations under two timber sales, neither of which is at issue here. On August 2, 1999, the district court determined on summary judgment that the Forest Service had failed to perform wildlife surveys as required by the Northwest Forest Plan prior to awarding certain other timber contracts in the Pacific Northwest, and expanded the preliminary injunction to include additional timber sales, again not including the sales at issue here. *See id.* at 1093, 1097. The district court rejected the Forest Service's theory that certain timber sales were exempt from the Plan's survey requirements because, according to the Forest Service, environmental impact assessments under the National Environmental Policy Act ("NEPA") had been successfully completed before the cut-off date and such NEPA determinations were equivalent to "implementation" of ground disturbing activities under the Plan.[1]

---

[1] The Forest Service had issued interpretive memoranda stating that timber sales for which environmental impact assessments had already been completed before the cut-off date were exempt from the Northwest Forest Plan's survey requirements, even if the actual ground-disturbing activities had not commenced before the cut-off date. *Oregon Natural*, 59 F. Supp. 2d at 1088. The Claims Court characterized this interpretation as the "NEPA decision equals implementation" interpretation. *See Liability Decision*, 86 Fed. Cl. at 113. The *Oregon Natural* plaintiffs challenged the validity of the Forest Service's administrative interpretation, and thereby

On August 26, 1999, the court expanded the preliminary injunction to include another twenty-five sales, including the Pigout, Jigsaw, and Whitebird sales. *See* Order on Additional Motions re Preliminary Injunction, *Oregon Natural Res. Council Action v. U.S. Forest Serv.*, No. 98-CV-942, slip op. at 9 (W.D. Wash. Aug. 26, 1999). In this order, the court noted that the Forest Service had "inform[ed] at least some purchasers that the sales were subject to litigation," and that "[e]ven without an explicit mention, the prospect of an injunction was obvious." *Id.* at 5. Pursuant to the court's order, the Forest Service suspended the Pigout, Jigsaw, and Whitebird contracts on August 31, 1999.

In November 1999, the Forest Service entered into a settlement agreement with the *Oregon Natural* plaintiffs under which the Forest Service agreed to "continue th[e] suspension of current operations" under certain timber harvesting contracts, including the Pigout, Jigsaw, and Whitebird contracts, until the Forest Service completed the required wildlife surveys. J.A. 214-15. The district court ordered compliance with the settlement agreement on December 17, 1999, and dismissed the case "subject only to reinstatement for enforcement against material breach" of the settlement agreement. J.A. 214.

In accordance with the *Oregon Natural* court's order, the Forest Service began conducting surveys for protected species in September 1999, and continued those surveys pursuant to the settlement agreement. The Jigsaw and Whitebird surveys were completed in the fall of 2000. However, Forest Service continued the suspension of the Jigsaw and Whitebird contracts due to litigation initiated

---

challenged the Forest Service's ability to proceed with timber sales in the region without completing the required surveys. *Oregon Natural*, 59 F. Supp. 2d at 1088.

on March 22, 2001, and titled *Umpqua Watersheds, Inc. v. U.S. Forest Service*, No. 01-399 (D. Or. Mar. 22, 2001). The *Umpqua Watersheds* plaintiffs, who had been co-plaintiffs in the *Oregon Natural* litigation, alleged that environmental assessments for lands including the Jigsaw and Whitebird plots "fail[ed] to adequately disclose and analyze the environmental impacts of the projects." *See* Order, *Umpqua Watersheds, Inc. v. U.S. Forest Serv.*, No. 01-399, slip op. at 3 (D. Or. Nov. 2, 2001) (describing complaint). On November 2, 2001, the *Umpqua Watersheds* court dismissed the claims affecting the Jigsaw and Whitebird contracts on res judicata grounds, *see id.* at 9-12, and the Ninth Circuit affirmed in relevant part on May 28, 2003, *Headwaters, Inc. v. U.S. Bureau of Land Mgmt.*, 65 F. App'x 636. The Jigsaw and Whitebird suspensions were subsequently lifted on June 9, 2003.

Meanwhile, the Pigout surveys were completed on August 7, 2001, and the Pigout suspension was lifted on June 11, 2002. The lifting of the Pigout suspension was not affected by the *Umpqua Watersheds* litigation. Scott subsequently harvested the total amount of timber covered by the Pigout, Jigsaw, and Whitebird contracts between 2004 and 2008.

II

On June 30, 2005, Scott filed an action in the Claims Court seeking damages for the government's alleged breach of the Pigout, Jigsaw, and Whitebird contracts. After a trial on liability, the Claims Court found the government liable for breaching each of the contracts. *See Liability Decision*, 86 Fed. Cl. at 104, 121. The Claims Court first concluded that the Forest Service's award of the three contracts without informing Scott of the risks to those contracts posed by the *Oregon Natural* litigation "amounted to a breach of [the government's] implied duty

[of good faith and fair dealing]." *Id.* at 118. Second, the Claims Court found that, while acting pursuant to the settlement agreement, the Forest Service "unreasonably delayed completing the surveys of the Pigout, Jigsaw, and Whitebird timber areas . . . [which] unduly lengthen[ed] the contract suspension periods." *Damages Decision*, 97 Fed. Cl. at 689-90 (summarizing liability decision). The Claims Court found that all of the required surveys could have been completed by the spring of 2000, but the Jigsaw and Whitebird surveys were not completed until the fall of 2000, and the Pigout surveys were not completed until August 2001. The Claims Court also found that the Forest Service "unreasonably . . . continu[ed] the suspensions of [the Jigsaw and Whitebird] contracts even after the requisite surveys had been completed, because of the existence of [the *Umpqua Watersheds*] lawsuit in which no injunction was ever issued." *Id.*

After a trial on damages, the Claims Court found that the government was liable not only for Scott's alleged losses, but also for those of Scott's sister company, Roseburg Forest Products. The Claims Court determined that the contracts required Scott to process the logs and that Roseburg was a subcontractor of Scott for this purpose. The Claims Court concluded that Scott was entitled to recover Roseburg's losses via a so-called "pass-through" claim, and that Roseburg experienced $6,771,397 in lost profits as a result of the lost opportunity to process the logs. The Claims Court determined that Scott itself was entitled to recover $28,742 in lost profits and $129,599 in additional costs to purchase commodity quality hem-fir logs to replace those it would have harvested under the contracts in 2000 and 2001. The Claims Court offset Scott's award by $62,638 to account for profits actually made in 2007 and 2008 on premium quality logs, but declined to offset Scott's award by Scott's profits actually

made in 2007 and 2008 on the Pigout, Jigsaw, and White-bird non-premium timber.

The government timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review legal conclusions of the Claims Court without deference and its findings of fact for clear error. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Contract construction is a question of law, which we review de novo. *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1364-65 (Fed. Cir. 2007).

I

The government challenges the Claims Court's holding that the Forest Service breached the implied duty of good faith and fair dealing by failing to notify Scott that the timber contracts were at risk of being suspended due to the *Oregon Natural* litigation.

As noted earlier, the *Oregon Natural* litigation was initiated in July 1998, but the Pigout, Jigsaw, and White-bird contracts were not originally identified in Oregon Natural's July 1998 complaint. The government conducted settlement negotiations "to avoid a temporary restraining order or preliminary injunction." *Liability Decision*, 86 Fed. Cl. at 106. In the course of the ongoing settlement negotiations in *Oregon Natural* (which occurred before the award of the contracts), each of the three contracts was identified by Oregon Natural on "lists of 'at risk' timber sales that [Oregon Natural] believed 'fail[ed] to comply with the Northwest Forest Plan, and . . . would need to be withheld from award pending [the] negotiations.'" *Id.* Pigout was identified as an "at risk" sale in a letter from Oregon Natural to the government

dated August 26, 1998. Jigsaw and Whitebird were later identified as "at risk" sales in a subsequent letter from Oregon Natural to the government dated July 6, 1999.

Although at each of the auctions in October of 1998 the Forest Service read a standard notice to "prospective bidders that the sale is currently under litigation and award [of the timber contracts] may be delayed," J.A. 207, and although the *Oregon Natural* litigation was a matter of public record, the government never notified Scott that Pigout was identified by Oregon Natural as an "at risk" sale before the October 1998 auction, or that Jigsaw and Whitebird were identified by Oregon Natural as "at risk" sales on July 6, 1999, immediately before the award of the contracts on July 8, 1999. Apparently, the government thought that the lists were confidential because they were part of a settlement negotiation.

The Claims Court held that due to "the circumstances surrounding why the suspension occurred and the degree of knowledge held by the Government at certain times, it was unreasonable for the Forest Service to have awarded these contracts to Scott without informing Scott of the specific risks to its contracts from the [*Oregon Natural*] litigation." *Liability Decision*, 86 Fed. Cl. at 118 (internal quotation marks omitted). The Claims Court accordingly held that the Forest Service's failure to inform Scott of the *Oregon Natural* litigation "amounted to a breach of its implied duty" of good faith and fair dealing.[2] *Id.* We disagree.

---

[2] The Claims Court termed the government's duty as an "implied duty to cooperate." *Liability Decision*, 86 Fed. Cl. at 118. We have previously recognized that the implied duty of good faith and fair dealing encompasses the implied duty not to hinder and the implied duty to cooperate. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 827 (Fed. Cir. 2010). For simplicity, we will

The Forest Service could not have breached the covenant of good faith and fair dealing by its pre-award conduct because the covenant did not exist until the contract was signed. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Restatement (Second) of Contracts* § 205 (1981). But that duty "does not deal with good faith in the formation of a contract." *Id.* cmt. c. As our sister circuits have explained, "because the existence of th[e] covenant [of good faith and fair dealing] depends on the existence of an underlying contractual relationship, there is no claim for a breach of this covenant where a valid contract has not yet been formed." *Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1171 (10th Cir. 2010) (internal quotation marks omitted); *see also AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001) ("[T]he covenant applies only to conduct during performance of the contract, not to conduct occurring prior to the contract's existence."); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998) ("[T]he implied covenant of good faith and fair dealing does not apply to . . . pre-contract conduct . . . ."). This does not suggest that pre-contract actions by the government cannot bear on the question of whether the government has complied with its obligations that are eventually imposed by the contract. For example, if the contract obligates the government to take action within a reasonable period, delays by the government even before contract signing may bear on the reasonableness of delays during the period that the contract is in force. *See Scott I*, 333 F.3d at 1368-69.

Although the Claims Court did not rely on the so-called "superior knowledge" doctrine, Scott seeks to sus-

---

refer generally to the government's implied duty of good faith and fair dealing.

tain the Claims Court's judgment on this theory. Even if Scott's claim were analyzed as a superior knowledge claim, it would nonetheless fail. "The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000).

> The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994) (internal quotation marks omitted).

As *Hercules* and other cases make clear, the doctrine only applies if "the government was aware the contractor had no knowledge of and had no reason to obtain such information" and "any contract specification supplied misled the contractor or did not put it on notice to inquire." *Id.* Here, the government explicitly put Scott (and all other bidders) on notice that the contracts were "currently under litigation and award may be delayed." J.A. 207. Though the Forest Service did not disclose that the Pigout, Jigsaw, and Whitebird contracts had been identified by the *Oregon Natural* plaintiffs on a list of "at-risk" contracts before the award, the government did not mislead Scott, and the pre-auction notice put Scott on notice of the risk that the contracts would be suspended. As the

*Oregon Natural* court itself noted, "[e]ven without an explicit mention, the prospect of an injunction was obvious. The [government] and the [timber company]-intervenors entered the timber sale agreements with knowledge that a suspension could occur." *Oregon Natural*, No. 98-CV-942, slip op. at 5 (W.D. Wash. Aug. 26, 1999). The notice here, in fact, was far more explicit than notices found sufficient in other cases. *See, e.g.*, *Glasgow Assocs. v. United States*, 495 F.2d 765, 766, 769 (Ct. Cl. 1974) (finding that the industry's general knowledge that government-guaranteed interest rates could rise gave the plaintiff sufficient notice to protect itself from such an increase and precluded a superior knowledge claim). Accordingly, the government satisfied any duty it had to disclose the pending litigation to Scott.[3]

We reverse the Claims Court's holding that the government is liable for breaching the duty of good faith and fair dealing in awarding the Pigout, Jigsaw, and Whitebird contracts to Scott.

## II

Scott contends that suspension was not authorized after December 17, 1999, because the suspensions were not thereafter necessary to "comply with a court order," but rather to comply with a settlement agreement in the *Oregon Natural* litigation. The Claims Court appears to have rejected this theory, *see Liability Decision*, 86 Fed.

---

[3]    The Claims Court also found that the Forest Service should have informed Scott of the "weakness of its 'NEPA decision equals implementation' interpretation." *Liability Decision*, 86 Fed. Cl. at 118. However, the government had no obligation to disclose the merit, or lack of merit, of any argument it was making before the *Oregon Natural* court.

Cl. 119-20, and Scott's contention is, in any event, without merit.

In the November 1999 settlement agreement with the *Oregon Natural* plaintiffs, the Forest Service agreed that it "shall continue th[e] suspension of current operations" under various timber harvesting contracts, including the Pigout, Jigsaw, and Whitebird contracts, "until Defendants have completed surveys and any species locations have been managed in accordance with the survey protocols and management standards applicable to such land management actions at the time of the Defendants' decision to lift th[e] suspension." J.A. 214-15. The district court entered the stipulation agreement as a formal order of the court and dismissed the case on December 17, 1999, "subject only to reinstatement for enforcement against material breach" of the settlement agreement. J.A. 214. Scott argues that the Forest Service did not have the authority to continue the suspensions of the contracts pursuant to the settlement agreement. We disagree.

Here, the surveys were initiated because the court had enjoined further operations under the contracts due to the Forest Service's previous failure to perform those required surveys. The settlement agreement provided for their continuation, and was the result of an order by the district court instructing the parties to negotiate such an agreement regarding the surveys. *See* Minute Order, *Oregon Natural*, No. 98-CV-942 (W.D. Wash. Aug. 27, 1999). The district court specifically ordered compliance with the settlement agreement. The district court contemplated that, if the surveys were not conducted, a court order would be entered enforcing the agreement and, for that purpose, maintained jurisdiction. *See* J.A. 214. The agreement specifically stated that the action was "subject only to reinstatement for enforcement against material breach of the following points of agreement." J.A. 214.

Among those "points of agreement" was the Forest Service's promise to "continue th[e] suspension of current operations" under various timber harvesting contracts, including the Pigout, Jigsaw, and Whitebird contracts, until, among other things, the required surveys were completed. J.A. 214. In this light, it is clear that the agreement was the equivalent of a "court order" within the suspension clause of the contracts. Accordingly, the Forest Service had the authority to continue the suspensions of those contracts while it was completing the surveys required by the settlement agreement.

## III

The government also challenges the Claims Court's holding that in conducting the surveys pursuant to the court order and settlement agreement the Forest Service "unreasonably delayed completing the surveys . . . [which] unduly lengthen[ed] the contract suspension periods." *Damages Decision*, 97 Fed. Cl. at 689-90.

This issue is directly controlled by *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010). As in this case, the Forest Service in *Precision Pine* had suspended timber-harvesting under contracts with identical suspension clauses in order "to comply with a court order." *Id.* at 828. "Because the suspensions were authorized, the only remaining question [wa]s whether the Forest Service's actions during the suspensions violated the implied duty of good faith and fair dealing." *Id.* We concluded that the Forest Service did not breach its implied duty of good faith and fair dealing because its actions during the suspensions "were (1) not 'specifically targeted,' and (2) did not reappropriate any 'benefit' guaranteed by the contracts, since the contracts contained no guarantee that . . . performance would proceed uninterrupted." *Id.* at 829.

Here too, Scott has not established specific targeting because there is no evidence that any delays in completing the surveys were incurred "for the purpose of delaying or hampering [Scott's] contracts." *Id.* at 830. Here too, the suspension clauses expressly qualified Scott's bargained-for harvesting rights, and uninterrupted performance cannot be considered a "'benefit' guaranteed by the contracts." *Id.* As in *Precision Pine*, the Forest Service's actions while conducting the required surveys did not breach its implied duty of good faith and fair dealing.

Scott argues that we should decline to apply *Precision Pine* because, according to Scott, it is inconsistent with our prior decision in *Scott I*, 333 F.3d 1358. As a panel, we are obliged to follow *Precision Pine* if the cases are consistent. *See Sacco v. Dep't of Justice*, 317 F.3d 1384, 1386 (Fed. Cir. 2003) ("A panel of this court is bound by prior precedential decisions unless and until overturned *en banc*."). The two cases are easily reconcilable. The timber contracts in *Scott I* were initially suspended in order to comply with a temporary restraining order. 333 F.3d at 1361. But the suspensions were continued under contract provision C6.01(a) after the expiration of the order "to prevent serious environmental degradation or resource damage." *Scott Timber Co. v. United States*, 40 Fed. Cl. 492, 501 (1998). We found that the "serious environmental degradation" clause only authorized suspensions for a "reasonable" period of time. *Scott I*, 333 F.3d at 1368. We held that if the suspension continued for an unreasonable period, there was a breach of the contract, and remanded for a determination of whether the prolonged suspensions were unreasonable. *Precision Pine*, as here, dealt with the "court order" clause, which does not require that the court order—issued by an independent court—be limited to a reasonable period of time. Despite the scope of the "court order" clause, Precision

Pine argued that the implied duty of good faith and fair dealing required that actions ordered by the court be completed in a reasonable period. As our predecessor court ruled in *David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981), "the assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing." Significantly, here, as in *Precision Pine*, the obligation to comply with the injunction is not owed to the timber company but to the court that issued the injunction and the party that sought the injunction. There is no basis for redefining the concept of good faith and fair dealing to include a requirement of diligence in complying with obligations imposed by another tribunal in a separate case. The only basis here to find liability would be if the government's purpose in delaying compliance with the injunction was to specifically target the plaintiff and reappropriate a benefit guaranteed by a contract with the plaintiff. *Precision Pine*, 596 F.3d at 829. Just as neither condition was satisfied in *Precision Pine*, neither condition is satisfied here. *Precision Pine* and *Scott I* are not inconsistent. [4]

We reverse the Claims Court's holding that the government is liable for the continued suspension of the

---

[4] The dissent suggests that *Precision Pine* and *Scott I* are irreconcilable because the contract suspensions in both cases were pursuant to a court order. Dissenting Op. at 6–7. In *Scott I*, however, the court order expired before the Forest Service allegedly breached its implied duty of good faith and fair dealing. *Scott I*, 333 F.3d at 1361. In contrast, a court order was in effect at the time of the alleged breach in *Precision Pine*. *Precision Pine*, 596 F.3d at 828. Here, *Precision Pine* is held applicable only in the period governed by the order, not in the period after the order expired, as to which the government sought to justify the delay on other grounds, an issue addressed in the following discussion.

Pigout, Jigsaw, and Whitebird contracts caused by delays in the completion of the required wildlife surveys.

## IV

The government also challenges the Claims Court's holding that the Forest Service was liable for the delay in lifting the Jigsaw and Whitebird suspensions after the surveys required by the *Oregon Natural* injunction and settlement agreement had been completed.

The government continued the suspensions of the Jigsaw and Whitebird contracts past the completion of the surveys in the fall of 2000 because of other environmental litigation in *Umpqua Watersheds v. U.S. Forest Service*, No. 01-399 (D. Or. Nov. 2, 2001). However, the Claims Court held that because "no injunctive order was ever issued in the *Umpqua Watersheds* litigation," the government had no "reasonable contractual basis" for continuing the suspensions. *See Liability Decision*, 86 Fed. Cl. at 120. The Claims Court also held that the government was liable for delaying the lifting of the Pigout suspension as to the portions of Pigout for which the surveys had been completed in 2000.

We need not reach the issue of whether the Forest Service had the authority to continue the suspensions, because, as described in detail below, Scott has failed to establish that it suffered any damages. *See Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605-06 (Ct. Cl. 1971) ("[T]here must be *some* evidence of damage . . . sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred."); *Puritan Assocs. v. United States*, 566 F.2d 1191 (Ct. Cl. 1977) (Table) ("Even if . . . the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was

damaged to some extent, by defendant's derelictions . . . .").

The $6,867,100 in damages to Scott had two components: (1) an award of $6,771,397 in damages attributed to the alleged loss incurred by Scott's sister company, Roseburg, and asserted by Scott via a pass-through claim; and (2) an award of $95,703 in damages attributed to the alleged loss incurred directly by Scott. We address each separately.

A

Under the *Severin* doctrine, Scott may assert a "pass-through" claim for Roseburg's damages, i.e., on behalf of a subcontractor, if Scott can establish that Roseburg is a subcontractor for the purposes of the Pigout, Jigsaw, and Whitebird contracts, and that Scott is liable to Roseburg for Roseburg's damages caused by the government's alleged breach. *See Severin v. United States*, 99 Ct. Cl. 435 (1943); *see also Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347-48 (Fed. Cir. 2008).

The Claims Court found that the domestic processing provision in each of the Pigout, Jigsaw, and Whitebird contracts obligated Scott to perform or provide for the processing of the harvested timber. The Claims Court then found that Roseburg was a subcontractor due to an "implicit" agreement with Scott, under which "Roseburg was required to process the logs that met its quality specifications, in accordance with the domestic processing requirements of Scott's Forest Service timber-sales contracts." *Damages Decision*, 97 Fed. Cl. at 696. The Claims Court thus held that Scott could recover Roseburg's alleged losses from the government.

We conclude that Scott did not have a legitimate pass-through claim against the government. The Pigout,

Jigsaw, and Whitebird contracts did not require Scott to provide for the processing of the harvested timber. Each contract described Scott's consideration with no reference to processing:

> In consideration of the premises and promises hereinafter contained, unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and *Purchaser agrees to purchase, cut and remove* Included Timber.

J.A. 55, 72, 90 (emphasis added). The Claims Court, however, relied on the domestic processing provision in each of the contracts, which stated in relevant part:

> CT8.641# - USE OF TIMBER. (10/96) This contract is subject to the Forest Resources Conservation and Shortage Relief Act of 1990 (16 U.S.C. 620, *et seq*.).
>
> . . . [U]nprocessed Included Timber shall not be exported from the United States nor used in direct or indirect substitution for unprocessed timber exported from private lands by Purchaser or any person as defined in the Act (16 U.S.C. 620e).
>
> . . .
>
> Unless otherwise agreed in writing, unprocessed Included Timber shall be *delivered to a domestic processing facility* and shall not be mixed with logs intended for export.
>
> . . .
>
> Prior to *delivering* unprocessed Included Timber to another party, Purchaser shall require each buyer . . . to execute an acceptable agreement, which shall: (a) identify the federal origin of the

> timber, (b) specify domestic processing for the
> timber involved, (c) require the execution of such
> agreements between the parties to any subse-
> quent transactions involving said timber, (d) re-
> quire that all hammer brands and/or yellow paint
> must remain on logs until they are either legally
> exported or domestically processed, whichever is
> applicable, and (e) otherwise comply with the re-
> quirements of the Act (16 U.S.C. 620d).

J.A. 71, 88-89, 106-07 (emphases added). This provision merely ensured compliance with export laws that require processing to be done domestically. The domestic process-ing provision only required that Scott "deliver[]" the harvested timber to a processor. The provision did not require that Scott provide for the processing of the timber, much less that Scott undertake the processing. Because processing is not required by the contracts, Roseburg cannot be considered a subcontractor for the purposes of those contracts.

Even if Roseburg were a subcontractor, Scott's pass-through claim would nonetheless fail. As stated above, in order to establish a pass-through claim Scott must also show that it is liable to Roseburg for Roseburg's damages caused by the government's alleged breach. *See Int'l Tech. Corp.*, 523 F.3d at 1347-48. Here, Scott simply agreed to use its "best efforts" to supply Roseburg with timber.[5] Specifically, "Scott was required to use 'best

---

[5] Scott argues that the implied contract between Scott and Roseburg was not a "best efforts" contract. However, the only evidence of the existence of the con-tract was the testimony of Mr. Ford, the president of both Scott and Roseburg, which, as the Claims Court found, explained that Scott was obligated "to use 'best efforts' to purchase, harvest, and provide Roseburg with logs." *Damages Decision*, 97 Fed. Cl. at 696.

efforts' to purchase, harvest, and provide Roseburg with logs." *Damages Decision*, 97 Fed. Cl. at 696. Even if the Forest Service's suspensions of the harvesting contracts were unauthorized, Scott did not breach its "best efforts" contract with Roseburg by abiding by the suspensions. "If, despite its best efforts," Scott could not provide Roseburg with the contracted-for timber, then Roseburg "obtained precisely what it bargained for, namely, [Scott]'s best efforts." *Gen. Dynamics Corp. v. United States*, 671 F.2d 474, 481 (Ct. Cl. 1982). Because Scott has not established that it is liable to Roseburg, Scott cannot assert a pass-through claim for Roseburg's alleged damages.

For these reasons, we reverse the award of $6,771,397 to Scott for the alleged damages incurred by Scott's sister company, Roseburg.

## B

Finally, we address the Claims Court's award of $95,703 in damages attributed to the loss allegedly incurred directly by Scott. The Claims Court determined that Scott was entitled to recover $28,742 in lost profits, plus $129,599 in additional replacement costs, minus $62,638 to account for profits actually made in 2007 and 2008 on premium quality logs. We first consider Scott's alleged lost profits, and then consider Scott's replacement costs.

## 1

After the contract suspensions were lifted in 2002 and 2003, Scott harvested the timber covered by the contracts between 2004 and 2008. Scott makes no claim that the government's alleged breach prevented it from harvesting other timber during the period of performance of the original contracts. Scott also does not claim that it could have harvested the three plots covered by the contracts

twice, once during the originally scheduled period, and once at the later time. Under these circumstances, Scott is limited to recovering any costs resulting from the delay in performance. But Scott made no claim on appeal that any delay in performance made the timber harvesting under the contracts less profitable than if the timber had been harvested in accordance with the original contracts. *See Restatement (Second) of Contracts* § 246 cmt. b, illus. 2 (a non-breaching party who accepts delayed performance may claim "damages for partial breach because of the delay"). Indeed, the $62,638 that Scott actually earned in 2007 and 2008 on premium logs alone was greater than Scott's alleged $28,742 in losses in 2000 and 2001 on all other grades of logs that would have been harvested and sold absent the suspensions. Accordingly, Scott has not established that any delay in performance of the Pigout, Jigsaw, and Whitebird contracts resulted in lost profits.

2

The Claims Court also awarded $129,599 in costs for replacing commodity-quality hem-fir logs that Scott would have harvested under the contracts in 2000 and 2001 absent the suspensions. This does not fall within the category of lost profits, and Scott makes no serious effort to provide an alternative theory for awarding these costs. Even if it had, there is no basis for such a claim. At the time of the alleged breach, Scott was entitled to elect one out of two options: (1) treat the suspensions as a total breach, seek to rescind the contract, and sue for damages including the costs of replacing the contracted-for timber; *or* (2) treat the suspensions as a partial breach, accept the government's delayed performance, and sue for damages caused by that delay. *See* Richard A. Lord, *Williston on Contracts* § 39:32 (4th ed. 2000) ("When one party commits a material breach of contract, the other party has a

choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach . . . .").

Scott chose to harvest the Pigout, Jigsaw, and White-bird lands after the suspensions were lifted and thereby elected to treat the suspensions as a partial breach. *See Williston on Contracts* § 40:1 ("[I]f a party in default under a contract is allowed to continue to perform, this precludes any right of the other party to rescind the contract or declare a material breach . . . because of any known default that has already taken place."). We have held:

> Damages [for a partial breach] are calculated on the assumption that both parties will continue to perform in spite of the breach. They therefore compensate the injured party only for the loss it suffered as the result of the delay or other defect in performance that constituted the breach, not for the loss of the balance of the return performance.

*Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1280 (Fed. Cir. 2008) (quoting E. Alan Farnsworth, *Farnsworth on Contracts* § 8.15 (2d ed. 2000)). Scott is thus precluded from recovering damages on a theory of material breach, including the $129,599 in claimed replacement costs.

For these reasons, we reverse the judgment of the Claims Court.

**REVERSED**

# United States Court of Appeals for the Federal Circuit

---

**SCOTT TIMBER COMPANY,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2011-5092

---

Appeal from the United States Court of Federal Claims in Case No. 05-CV-708, Judge Charles F. Lettow.

---

WALLACH, *Circuit Judge*, dissenting.

The court errs when it finds *Scott I* and *Precision Pine* reconcilable and *Scott I* inapplicable in this case. *See* Majority Op. at 15-18. These cases are irreconcilable, and therefore this court should take the case en banc to resolve the conflict the two cases present or the panel should hold that *Scott I* is the earlier, and therefore precedential, decision over *Precision Pine*.

In *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) ("*Scott I*"), Appellant Scott Timber sought review of the Court of Federal Claims's ("Claims Court") grant of summary judgment which determined that the Forest Service did not breach Scott Timber's eleven timber sales contracts when it suspended performance on the

contracts to protect the marbled murrelet, a threatened species. *Id.* at 1360. We held, *inter alia*, that the text of clause C6.01 expressly granted the Forest Service the authority to suspend the contract. *Id.* at 1366. We also found that "clause C6.01 does not authorize the Forest Service to indefinitely or permanently suspend the contracts." *Id.* at 1368 (internal quotation omitted). We articulated the proper course of action: "Therefore, in order for the prolonged suspensions in this case to be considered a breach of the C6.01 contracts, the court must determine whether the suspensions were reasonable." *Id.* (internal quotation omitted). Ultimately we remanded the determination of reasonableness to the Claims Court, noting that "[b]ecause the reasonableness issue is intensely factual, this court finds that the [Claims Court] erred when it determined the suspensions were reasonable on summary judgment." *Id.* at 1369.

*Scott I*, albeit *sub silentio*, fully addressed the duty of good faith and fair dealing. Scott Timber originally argued before the contracting officer "that the Forest Service did not possess the contractual authority to suspend any of the contracts at issue for an extended and indefinite period of time, and that the Forest Service's continued suspension of the contracts therefore violated the government's duty not to unduly hinder Scott's performance of the contracts." *Scott Timber Co. v. United States*, 40 Fed. Cl. 492, 499 (1998), *rev'd* 44 Fed. Cl. 170 (1999).[1]

The Claims Court noted that Scott Timber's arguments in support of summary judgment were "virtually

---

[1]    In *Precision Pine*, we noted that both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010).

identical" to those raised before the contracting officer. *Id.*
Scott Timber moved for summary judgment, arguing "that
the Forest Service's suspension of [the] contracts amounts
to a breach of the government's implied duty to cooperate
and not hinder plaintiff's performance of the contracts."
*Id.*   The Claims Court noted that Scott Timber correctly
argued that "the Forest Service was under an implied
duty to act reasonably in exercising its discretion under
Clause C6.01 . . . ."   *Id.* at 502.   The Court of Federal
Claims ultimately denied Scott Timber's motion for sum-
mary judgment, *id.* at 507, and granted summary judg-
ment to the government, *Scott Timber*, 44 Fed. Cl. at 183.

Scott Timber appealed to this court challenging the
Claims Court's decisions. Brief of Appellant, *Scott Timber
Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) (No.
02-5142), 2002 WL 32817253.   On appeal, Scott Timber
specifically argued that breach of the implied duties
occurred and that reasonableness was the proper stan-
dard for measuring the breach.  It stated:

> [The contract language] does not mean that the
> [Forest Service] can modify or cancel a contract
> based on information that it had at the time of
> bidding but which it chose not to disclose or that
> the [Forest Service] can mislead the contractor by
> making representations that it has complied with
> certain procedures in preparing the contract speci-
> fications when it had not. *Such an interpretation
> would be in direct conflict with the [Forest Ser-
> vice's] implied obligation of good faith and fair
> dealing* as well as its affirmative duty not to mis-
> lead its contractors.

*Id.* at *27 (emphasis added).  Scott Timber contended that
"the [Forest Service's] suspension of Scott's contracts was
unreasonable . . . [and] any unreasonable delay by the

[Forest Service] in gathering facts in order to determine whether to modify, cancel, or go forward with the contracts constituted a breach of the [Forest Service's] implied duty of cooperation." *Id.* at *37. Scott Timber also argued that the Forest Service's failure to follow the time periods for action set forth in the Endangered Species Act was evidence of unreasonableness sufficient to show "a breach of the implied duties to cooperate and not to hinder the other party's performance." *Id.* at *40. Scott Timber's Reply Brief also emphasized the implied duties. Scott argued that the contract language "cannot be read in a vacuum as the government suggests but must be read in light of the [Forest Service's] implied duty of good faith." Reply Brief of Appellant, *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) (No. 02-5142), 2003 WL 24031963.

While *Scott I* focused on the reasonableness of the government's actions, the history of the case demonstrates that the purpose for discussing reasonableness was as a measure for the type of breach of implied duties claimed by Scott Timber.

More recently, in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010), we revisited the same contractual provisions in a different procedural posture. Fourteen contracts were awarded to Precision Pine & Timber, Inc. ("Precision Pine") between June 1991 and July 1995. *Id.* at 821. In August 1995, these contracts were suspended when a federal district court ordered the Forest Service to consult the U.S. Fish and Wildlife Service about the impact on the Mexican spotted owl of harvesting timber. *Id.* at 819-20. Precision Pine subsequently brought suit at the Claims Court, which found that the government had breached some, but not all, of the provisions of its contracts. *Id.* at 823-24. We reiterated that clause CT6.01 expressly granted the

Forest Service the authority to suspend the contract. *Id.* at 828-29. We also held, *inter alia*, that the Forest Service's actions did not breach any implied duty of good faith and fair dealing. *Id.* at 830. We determined in *Precision Pine* that there was no breach of the implied duty of good faith and fair dealing, because "the Forest Service's actions during these formal consultations were (1) not 'specifically targeted,' [at a benefit of Precision Pine's contract] and (2) did not reappropriate any 'benefit' guaranteed by the contracts, since the contracts contained no guarantee that the Precision Pine's performance would proceed uninterrupted." *Id.* at 829.

Both *Scott I* and *Precision Pine* articulate a standard to be applied with regards to the implied duty of good faith and fair dealing in the context of the relevant contract provision, and the two are squarely opposed. The majority states that *Scott I* and *Precision Pine* are reconcilable because *Scott I*'s timber contracts were suspended, after the expiration of a temporary restraining order, "under contract provision C6.01(a) . . . to prevent serious environmental degradation or resource damage," whereas *Precision Pine*'s timber contracts were suspended pursuant to the "court order" clause of the contracts. Majority Op. at 16-17.[2]

---

[2]    Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
   (a) To prevent serious environmental degradation or resource damage that may require contract modification under CT8.3 or termination pursuant to CT8.2;
   (b) To comply with a court order, issued by a court of competent jurisdiction . . . .
J.A. at 67-68, 85, 103.

This is a distinction without a difference. We cannot reconcile these cases based on whether or not the suspension is pursuant to a court order because federal agencies, like the Forest Service, are required by statute to suspend affected timber sales under these circumstances. 16 U.S.C. § 1536(d).[3] In other words, the facts of this case and other similar cases render the timber sales automatically suspended without regard to how the suspensions were initiated; in some cases there may be a court order, in some cases not, but federal agencies are bound by statute to suspend in either situation.[4]

Additionally, factually, the present case parallels *Scott I* not *Precision Pine*. The suspension of the contracts at issue was initially pursuant to a district court order but then was pursuant to no court order at all, but

---

[3]     d) Limitation on commitment of resources. After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).
16 U.S.C. § 1536(d).

[4]     In *Precision Pine*, we noted: "While such consultations are taking place, § 7(d) of the [Endangered Species Act] prohibited the Forest Service from making any 'irreversible or irretrievable commitment of resources' during the consultation process. 16 U.S.C. § 1536(d)." *Precision Pine*, 596 F.3d at 821. "The Ninth Circuit further explained that pursuant to its decision in *Lane County Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir. 1992), timber sales were 'per se irreversible and irretrievable commitments of resources under section 7(d) [of the ESA], and thus could not go forward during this consultation period.'" *Id.* at 822 (quoting *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994)).

pending litigation in a separate and unrelated case. *See* Majority Op. at 6-7 ("However, Forest Service continued the suspension of the Jigsaw and Whitebird contracts due to litigation initiated on March 22, 2001 and titled *Umpqua Watersheds, Inc. v. U.S. Forest Service*, No. 01-399 (D. Or. Mar. 22, 2001)."). *Precision Pine*, on the other hand, suspended pursuant to a court order. *See id.* at 14. *Scott I* suspended pursuant, initially, to a court order, and then pursuant to no court order at all. *See id.* at 15.

The correct inquiry under clause C6.01, as stated in *Scott I*, is to "determine whether the suspensions were reasonable," *Scott I* at 1368 (internal quotation omitted), regardless of the sub-provisions those suspensions invoked.

As a result, we are required to seek en banc resolution or to follow the holding in *Scott I*, our earlier and therefore precedential decision.[5] The panel has rejected both of these options; I respectfully dissent.

---

[5]    *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*. Where there is a direct conflict, the precedential decision is the first.") (internal citation omitted); *see also Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1309 (Fed. Cir. 2008) ("A prior precedential decision on a point of law by a panel of this court is binding precedent and cannot be overruled or avoided unless or until the court sits *en banc*."); *cf. Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc.*, 651 F.3d 1355, 1363 (Fed. Cir. 2011) ("Even if Leviton's reading of the import of that statement were correct, this would not be a direct conflict of panel opinions as is necessary to invoke this court's rule of precedence.").