ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| ASCT Group, Inc. | ) ASBCA No. 61955 |
| | ) |
| Under Contract No. 000000-00-0-0000 | ) |

APPEARANCE FOR THE APPELLANT:          David J. Muchow, Esq.
                                         Muchow Law
                                         Arlington, VA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                         Engineer Chief Trial Attorney
                                       James D. Stephens, Esq.
                                       Rebecca L. Bockmann, Esq.
                                         Engineer Trial Attorneys
                                         U.S. Army Engineer District, Middle East
                                         Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

Appellant, Afghan Azimi Group of Supply Construction and Technical, Inc. (ASCT), was a subcontractor to Advance Constructors International, LLC (ACI) on ACI's prime contract with respondent, the U.S. Army Corps of Engineers (USACE or government), for construction of the Kandahar Regional Police Training Center, in Kandahar Province, Afghanistan. In February 2013, the USACE terminated ACI for default, due in part to its failure to pay ASCT and other subcontractors. When the USACE terminated ACI for default, it planned to retain another contractor to complete the project, and anticipated giving preference to a contactor that would employ ACI's subcontractors. Accordingly, the USACE held an informational meeting with ACI's subcontractors and subsequently sent an email "requesting" that subcontractors not remove from the job site their material that had not been paid for by ACI. The email stated that the government has "procedures that it can use to pay" for the material. ACI indicated its desire to sell its materials to the government, and followed-up with the USACE multiple times. In November 2013, the project was cancelled and the site was returned to the Government of Afghanistan.

ACI challenged the USACE's termination decision before the Board. In 2015, the parties worked-out an unusual settlement where the USACE converted the termination for default into a no-cost termination for convenience, and used the unpaid contract balance to fund an escrow account to reimburse ACI's subcontractors for a portion of their unpaid invoices. In 2016, ASCT sued ACI in Delaware State Court

seeking $2.8 million. ASCT obtained a judgment against ACI but ultimately settled the dispute for a $430,000 payment from ACI, that was reimbursed by the escrow account. ASCT's settlement with ACI contains a carveout purporting to exempt from the release ASCT's claims against the USACE.

In 2018, ASCT filed a claim with the USACE asserting entitlement of $1,898,835.40 for its material, security and warehousing expenses, construction equipment, and attorney fees. ASCT asserted that the contracting officer's oral statements in the meeting, and the email requesting that subcontractors not remove their material, were an offer by the government to purchase ASCT's material and equipment, and that ASCT accepted the offer by performance, creating an implied-in-fact contract. The contracting officer awarded ASCT $78,936 based on a finding that an implied-in-fact contract "might be interpreted to exist," but that the scope of the implied-in-fact contract was only for storage of material from the February 2013 email until November 2013 when the project was cancelled. We review the appeal *de novo* and hold that ASCT has not demonstrated the existence of an implied-in-fact contract, and deny the appeal.

FINDINGS OF FACT

### A. The Contract and Subcontract

On March 31, 2011, the government entered into Contract No. W5J9LE-11-C-0020 with ACI, for the construction of a regional police training facility in Kandahar Province, Afghanistan (R4, tab 30 at 2). Notably, the contract waived the bonding requirements normally contained in government construction projects (tr. 207-08).[1] The waiver was in response to contractors experiencing difficulty in obtaining bonding for contracts being performed in a war zone (*id.* at 208). The policy permitting waiver of the bonding requirements has since been revoked (*id.*). However, absent a payment bond, there was not a surety to step-in and pay the subcontractors in the event, as was the case here, that the prime contractor failed to pay its subcontractors.

On or about January 8, 2012, ACI entered into a subcontract agreement with ASCT, a small family-owned business (R4, tab 4, tr. 19). Pursuant to the subcontract, ASCT would be paid $5,322,065 for construction of the project's dining facility (DFAC), the DFAC's dry storage, four classroom facilities, and a latrine facility (R4, tab 4 at 1-2). ACI was to pay ASCT according to an approved schedule of values (*id.*; tr. 91-92), with ASCT required to submit a schedule of values with its requests for payment (R4, tab 4 at 6). ACI paid ASCT $2,607,848 prior to the project's termination, leaving a remaining balance of $2,714,217 on the subcontract (R4, tab 44 at 1). ASCT

---

[1] *See Assist Consultants*, *Inc.*, ASBCA Nos. 61525, 62090, 21-1 BCA ¶ 37,850 for an example of an Afghan contractor being unable to meet the bonding requirements.

2

purchased all the materials and equipment at issue in this litigation as a part of its performance under the subcontract (tr. 117).

### B. USACE's Termination of ACI for Default

In late 2012, ACI's subcontractors notified the government that ACI was not paying them (R4, tab 30 at 2; tr. 154-55). ASCT alleges that ACI stopped paying it in October of 2012 (tr. 38, 92, 154-55). ASCT stopped performing on the project on December 17, 2012 (tr. 38-39, 172-73). In the weeks that followed, the USACE investigated the allegations of ACI's subcontractors, and took action after concluding that ACI was not paying its subcontractors (tr. 155-58). The government began to withhold retainage from ACI on the contract both due to ACI's failure to make progress on the project, and because it believed ACI had made misrepresentations on its progress payment certifications relating to subcontractor payments (*id*.; R4, tab 30 at 1, 3, 6-7; and FAR 52.232-27, Prompt Payment for Construction Contracts (JAN 2017)). In particular, the government rejected ACI Pay Request No. 22 outright "due to concerns regarding payment to subcontractors" (R4, tab 30 at 7; tr. 155-57). In total, the government withheld $2,506,615.09 from ACI's progress payments over this issue (R4, tab 31 at 1). The government decided to terminate ACI for default in part due to its failure to pay its subcontractors on the contract (R4, tab 30 at 8-10; tr. 158-64).

On February 14, 2013, the government held an informational meeting for ACI's subcontractors at a government construction office (tr. 188, 191-94). The government notified the project's subcontractors of its intention to terminate ACI, informed the subcontractors of the next steps in the reprocurement process, and inquired whether the subcontractors were interested in working for the replacement contractor, or in selling their materials (tr. 90-91, 185-89). Additionally, the government instructed ASCT not to deliver any more materials to the project site (tr. 91).

ASCT's Vice President, Mr. Abdul Azimi, testified that, at the February 14, 2013 meeting, Mr. Boddie, the contracting officer, "promised that [the USACE] had procedures that they will [use to] pay for the materials directly" (tr. 48). ASCT additionally submitted affidavits from three other individuals who attended the February 14, 2013 meeting, each with similar wording, and each dated February 25, 2021, more than eight years after the meeting. Mr. R. Mohammad, the CEO of Bilal Adil Construction Co., another subcontractor to ACI on the project, stated that Mr. Boddie "clearly promised the subcontractors attending, that there was a process from USACE for recovery of funds expended by the subcontractors to date for materials and equipment that were purchased for the subject contract; and for continuing to provide security, and that we would be paid for all the project related expenses incurred" (R4, tab 50 at 1-2). Mr. Ismat Ullah Samadee, the former President of Sadiq Noor Construction Company, another subcontractor to ACI on the project, states that Mr. Boddie "promised, in no uncertain terms, that there was a process for

3

recovery of funds expended by the subcontractors to date for materials and equipment; and for continuing to provide security, and that we would be paid for all of that" (R4, tab 51 at 1-2). Mr. Mohammad Azimi, a partner in ASCT and the project manager, stated that Mr. Boddie "clearly promised that there was a process for recovery directly from USACE for the costs incurred by the subcontractors for materials and equipment procured for the subject contract; and for continuing to provide security" (R4, tab 52 at 1-2).

Conversely, Mr. Boddie testified that, at the meeting, he stated "that there was a process where the Government could buy the material . . . [a]nd use it, especially the long lead items and such that were onsite . . . [and] hand that over to a new contractor as Government furnished material" (tr. 188-89). Mr. Boddie further explained that his statements at the meeting were an "explanation of potential of what we could do" (tr. 195).

There is no transcription or recording of the meeting in the record. Mr. Azimi testified that he and the other subcontractors were not permitted to bring any electronics through security, but that they were informed that the meeting was being recorded (tr. 45-47). Mr. Boddie testified that electronics would have been collected as a security measure and that he was aware that there was supposed to be a recording of the meeting, but that it was not done at his request (tr. 227-28).

On February 17, 2013, ASCT sent copies of its unpaid invoices to the government by email[2] (R4, tab 19 at 1). On February 19, 2013, the government terminated ACI for default (R4, tab 30 at 1). In its termination decision, the government instructed ACI to "[s]top all work, make no further shipments, and place no further orders," except for authorized work-in-progress or materials it wanted for itself (*id*. at 10-11). ACI appealed the government's termination for default decision to the ASBCA in No. 58604 (R4, tab 31 at 1; tr. 166). At the time of the termination, ASCT claimed ACI owed it $1,246,570.09 for its October, November, and December 2012 invoices (R4, tab 26 at 1; tr. 92).

### C. Post-Termination Communication with ACI's Subcontractors

On February 25, 2013, the government sent an email to ACI's subcontractors, including ASCT, that summarized the information provided at the February 14, 2013 meeting (R4, tab 8; tr. 194-96). The email stated in relevant part:

> USACE has now begun the process of selecting a new
> prime contractor to complete the RPTC

---

[2] Although the invoices are not included with the email at R4, tab 19, the invoices are in the record at R4, tab 45 (tr. 221)

project. . . . When USACE selects the new prime contractor, it will give preference to potential prime contractors that promise to award subcontracts to the companies that formerly had subcontracts under ACI. . . .

In the meantime, USACE wants to be sure that activity continues at the construction site during the time it takes to choose the new prime contractor. USACE has decided to work with one of ACI's former subcontractors, Areyana Group, to have it be the prime contractor for a limited amount of work over the next 3 months. . . . The details of that short-term contract will be announced to this group as soon as it is finalized. . . .

Regarding your own company's materials that are on site but were never paid for by ACI, we request that you do not remove them. As I explained in our meeting on 14 February, USACE has procedures that it can use to pay you for those materials so that they can be used to finish building the project. Please contact me if you are interested in selling those materials to USACE.

(R4, tab 8 at 1-2). Mr. Azimi testified that the email was consistent with the oral statements at the February 14, 2013 meeting (tr. 49-50, 95-96) and Mr. Boddie similarly confirmed that the email was consistent with his statements at the meeting (tr. 195-96).

Based on the record before us, we find that Mr. Boddie's statements at the February 14, 2013 meeting are consistent with the February 25, 2013 email summary of the meeting, and find that Mr. Boddie's statements, did not constitute an offer to purchase ASCT's material or equipment, or to compensate ASCT for its storage expenses. ASCT's witness testimony at the hearing, and declarations, are not consistent with the contemporaneous email summary.

On March 14, 2013, ASCT responded to the contracting officer, stating "as we owe most of the suppliers now for the procured materials, it would be of our mutual benefit to sell you our procured materials for your future plans. And it would be our pleasure to know how long will it take for the process, and what you would require us to send you" (R4, tab 9 at 3). The government responded that same day indicating that its Local National Quality Assurance (LNQA) representatives would inventory the property (R4, tab 9 at 3). On March 20, 2013, after an exchange of emails concerning the nature of the materials and questions from ASCT about how long the process would take, a government representative informed Mr. Abdul Mateen Azimi, ASCT's

5

Vice-President, that he did not "know how long the process will take," that it was "for the contracting officer to take action on," and that the government would "eventually (I think) process the stored materials for payment but the Contracting Officer is running the show." (*id*. at 2). On March 25, 2013, ASCT sent an email to the government contracting officer, Mr. Edward Boddie, stating:

> As was requested from your side by email, and agreed in the meeting, it was stated that the procured material for this project that are not billed to ACI will be paid by USACE.
>
> The lists were sent to your attention for the material we had procured for our project, that are not billed to ACI.
>
> But neither a positive nor negative response have been clarified from your side for the procurements payment and processing.
>
> So please let us know, if these materials will be procured by USACE and paid to us or not?

(*id* at 1). There is no record of the government contracting officer ever replying to this email. ASCT's own witness testified that ASCT understood there were additional steps in the process toward reaching an agreement relating to the material (tr. 106-11).

On June 19, 2013, the District Engineer of the Afghanistan Engineer District- South, COL Vincent V. Quarles, furnished a copy of a letter to ASCT, in which he explained to another ACI subcontractor that, although he understood the passage of time relating to the progress of reprocuring the project was financially problematic, "the needs of the end-user of the facility have been changing as the conditions on the ground change" (R4, tab 10 at 2). On June 26, 2013, the government contracting officer provided a presentation to the former ACI subcontractors, in which he stated:

> A. The needs of the Afghan National Police have changed. As a result, the ANP now needs fewer buildings of each type.
>
> B. Because of these changes, USACE will be re-starting the selection of a new prime contractor for the RPTC project.
>
>     ***

6

2.  The old RFP has been canceled, and a new RFP will be issued.

***

A.  As explained during the February meeting, there is an opportunity for the subcontractors to have the materials they purchased for the original contract be used in the new contract.

B.  To take advantage of the opportunity, former ACI subcontractors must provide the contracting officer with documentation that proves that materials were purchased for the ACI prime contract, and not paid for by ACI.

   1.  USACE needs copies of invoices.

   2.  If materials are still on site, USACE also needs photographs showing the quantity of materials and their current location.

C.  If a former ACI subcontractor wants to remove the company's materials from the RPTC site, the company has to provide acceptable proof of ownership, and then USACE will make arrangements to give the company access to the site to remove the materials.

(R4, tab 11 at 1).  ASCT understood that if it wanted to remove its materials from the project it was free to do so as long as it could prove its ownership to the materials (tr. 111-13).

On July 15, 2013, ASCT sent an email to the contracting officer, referencing prior contact between the parties, providing a spreadsheet detailing $907,612.51 in procured materials[3] (R4, tab 12 at 2, 4-5).  At no point did the government's contracting officer believe that he made an offer to purchase materials from ACI's subcontractors (tr. 174-75).  On November 23, 2013, the contracting officer sent a letter to one of ACI's subcontractors informing the company that the government had cancelled the solicitation relating to the project's reprocurement, that the requirement was also cancelled, and would no longer be executed by the USACE (R4, tab 13 at 3).  ASCT

---

[3] Once again, the document at Rule 4, tab 12 does not contain any attachments; however, the attachments are located at Rule 4, tabs 20-24.

received this letter on November 27, 2013 (*id.*, at 1). ASCT sent an email to Navy Commander Keith Jensen on November 28, 2013, acknowledging the reprocurement's cancellation, and asserting that it had not removed its materials, and had incurred security and warehousing expenses based on the government's promise to procure the materials (R4, tab 14 at 3-4). Commander Jensen responded on December 1, 2013, by referring ASCT to the Government of Afghanistan (*id.* at 2). ASCT contacted Commander Jensen on December 5, 2013, and on December 14, 2013, again asserting a USACE promise to procure ASCT's materials (*id.* at 1-2). Since taking control of the construction site, the Government of Afghanistan has not permitted ASCT to remove its materials from the site (tr. 62).

In a May 18, 2014 email, ASCT's then counsel, Sher Saeedi, contacted Lieutenant Colonel Gary Davis, the District Chief of Contacting, seeking to "resolve this issue in an amicable way" (R4, tab 16 at 4). Mr. Saeedi's email asserted that ASCT had been "left in a limbo by USACE with assurances of purchase of the goods at the site" (*id.*). That same day, LTC Davis, informed ASCT that an agreement to pay it for materials or material storage was "not allowed," because the government was not in a contract with ASCT (*id.* at 3). In a May 27, 2014 email, Mr. Saeedi asserted that ASCT had decided not to remove its materials, and had incurred additional security costs, based on USACE's assurances (*id.* at 2). Mr. Saeedi again contacted LTC Davis on June 9, 2014, stating that he had not heard back from the government and requesting a response (*id.* at 1).

### D. ACI's Appeal of the USACE Termination for Default

Mr. Edward Boddie, the contracting officer involved in the decision to terminate ACI for default and ultimately to settle ASBCA No. 58604, testified that he only settled the appeal to ensure that the progress payments withheld by the USACE could be used to compensate subcontractors unpaid by ACI (tr. 168-69). The government used the full amount of the termination litigation settlement ($2,206,615.09) to fund a trust account that was used exclusively to ensure ACI reimbursed its subcontractors, including ASCT, less certain legal and administrative fees it had incurred during the litigation (tr. 169-71; R4, tab 31 at 2-4). Mr. Boddie did not wish to pay ACI directly, out of an abundance of concern regarding ACI's prior nonpayment issues (tr. 168-69). In exchange for this arrangement, ACI and the government agreed to a no-cost termination for convenience (tr. 171-72). ACI received no direct compensation from the settlement-established trust account, only reimbursement after it paid other parties (tr. 170-71).

### E. ASCT Brings Suit Against ACI in Delaware State Court

ASCT asserts that its remaining balance on the subcontract was $2,714,217 (R4, tab 44 at 1). Due to ACI's default on the contract ASCT never completed the

subcontract, and at the time of the termination ASCT asserted that it was owed $1,246,570.09 by ACI (R4, tab 26 at 1; tr. 92). In 2016, ASCT sued ACI in Delaware Superior Court for $2,838,360.52, and obtained a judgment in the amount of $2,838,610.52 (R4, tab 27 at 1). ASCT entered into a settlement with ACI regarding this litigation, and obtained $430,000 from ACI, an amount financed by the trust account created by the government's settlement agreement with ACI relating to their default termination litigation (R4, tab 6 at 1-2; tr. 70, 169-71; R4, tab 31 at 2-4). As a part of its resolution of its litigation with ACI, ASCT executed a release of claims discharging its right to pursue ACI further under the subcontract (R4, tab 6 at 1). However, the release included a purported carve-out for ASCT's potential claim against the USACE, authorizing ASCT to pursue "any equitable adjustment claim(s), as well as any claim(s) based on quantum meruit, estoppel or other legal theories . . . in connection with, materials purchased by ASCT in connection with the RPT Project or their diminution in value, as well as related storage, security and other costs and expenses" (*id.*).

### F. ASCT Offers to Sell Materials to Government and then Files a Claim

On April 10, 2017, ASCT's prior legal counsel, David Felice, sent an email to the government, stating that "I am writing to gauge the Corps' interest in purchasing the materials ASCT maintains on the project site and to reimburse ASCT for expenses related to maintaining and securing the materials for the past several years" (R4, tab 32 at 1). On June 8, 2017, Mr. Felice again contacted the government, writing "[m]y client would like to know if the USACE intends to negotiate a resolution to this matter or not" (R4, tab 17 at 1). The government did not express any interest in purchasing the materials or reimbursing ASCT for expenses (tr. 75-76).

On June 27, 2018, ASCT filed a certified claim seeking $1,898,835.40, comprised of $886,890.09 for materials; $463,329.45 for security and warehousing expenses; $200,130 for accommodations and a camping facility; $277,064.24 for construction equipment; and $71,421.62 for attorney's fees (R4, tab 3 at 12).[4] ASCT's claim asserts that the USACE's request that ASCT not remove its materials created an implied-in-fact contract whereby the government would directly compensate ASCT for its materials and, since the government never rescinded these instructions, ASCT was also entitled to be compensated for its storage costs to present (*id.* at 11). The USACE

---

[4] ASCT's claim asserts that it is based on implied-in-fact contracts with the USACE (R4, tab 3 at 7). However, ASCT asserts that there are other legal bases which may apply, including a unilateral contract, "*quantum meruit . . ., quantum valebant . . .* unjust enrichment, promissory estoppel, implied-in-law contracts, conversion, and taking of property without just compensation under the Fifth Amendment" (*id.* at 9-10).

contracting officer issued her final decision on October 31, 2018, finding partial merit in ASCT's claim (R4, tab 2 at 1-2). The contracting officer found no evidence that the government had expressed an interest in purchasing ASCT's equipment, labor camp, or materials warehoused in Kabul and in Pakistan (*id*. at 7-8). In addition, the contracting officer found that the parties had not reached a meeting of the minds regarding a transaction with government paying ASCT for its materials (*id.*). However, the contracting officer found that "an agreement might be interpreted to exist" whereby the government, in essence told ASCT to "keep your property already at the Project, since the Government might need it, and in exchange the Government will pay you for the costs incurred in keeping the material safe" (*id.* at 8). The contracting officer found that this was an implied-in-fact contract that ended on November 28, 2013, when ASCT learned that the government had cancelled the reprocurement, and awarded ASCT $78,936, conditioned on ASCT submitting a proper invoice for the verified costs (*id.* at 11). ASCT timely appealed to the Board (notice of docketing Feb. 1, 2018). ASCT's complaint, dated March 4, 2019, asserts five counts, but an implied-in-fact contract is the only legal theory properly developed.[5] Count IV of ASCT's complaint, "Discussion of ASCT's Claim" asserts that there was a Fifth Amendment taking of ASCT's property, and that the government was negligent in failing to properly investigate and supervise ACI, causing ASCT's losses (compl. at 35).

In this appeal, ASCT asserts that it is entitled to the same amounts as contained in its claim, plus an additional $54,612.39 in warehouse and security fees (compl. at 36). ASCT estimates that $366,088.23 in material and all of its equipment was on the project site, with the remainder of material ($520,801.86) located either in Kabul, Afghanistan or in Pakistan (R4, tab 21 at 3). ASCT assumed that the government wanted its off-site materials (which it warehoused), its equipment, and its camp facilities (tr. 48, 100-04, 123-24, 126).

After ASCT filed its complaint, the government filed a motion to dismiss. The Board denied the motion to dismiss on February 27, 2020. *ASCT Group*, *Inc.*, ASBCA No. 61955, 20-1 BCA ¶ 37,540. In our earlier decision, the Board noted that both

---

[5] Rather than presenting legal theories, the "counts" in ASCT's complaint mostly present argument regarding the proper calculation of its claimed damages. Count I of the complaint is "The Amount Already Offered in the Final Decision for Costs of Security and Staffing Should be Increased to Reflect the Actual Costs" (compl. at 15). Count II of the complaint is "All of the Amounts Claimed Should be Paid. The Following are Point-by-Point Answers to the Final Decision's Denial of Appellant's Claims" (*id.* at 17). Count III of the complaint is "Appellant is Clearly Entitled to Recovery Under the Implied-in-Fact Contract Doctrine" (*id.* at 25). Count IV of the complaint is "Discussion of ASCT's Claim" (*id.* at 32). Count V of the complaint is "Details of the Claimed Compensation" (*id.* at 35).

parties "agree that the Board does not have jurisdiction over claims sounding in tort independent of a contract, and does not have jurisdiction of Fifth Amendment taking claims" and that ASCT had confirmed that it was only asserting a contractual cause of action. *Id.* at 182,289.

DECISION

ASCT asserts that it is entitled to recover based on the existence of an implied-in-fact contract between the USACE and ASCT created by the contracting officer's statements at the February 14, 2013 meeting. The government disputes the existence of an implied-in-fact contract and additionally asserts that an implied-in-fact contract is precluded by the existence of an express contract between ACI and ASCT for the same materials, and, even if there were an implied-in-fact contract, the off-site materials, and camp facilities were not part of the contract.

## I. Implied-In-Fact Contracts

The Board possesses jurisdiction to entertain implied-in-fact contracts. In order to establish the existence of an implied-in-fact contract with the United States, ASCT must establish the same elements as for a written contract: (1) mutuality of intent to contract; (2) consideration; (3) unambiguous offer and acceptance; and (4) actual authority on the part of the government representative whose conduct is relied upon. *See*, *e.g.*, *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Like an express contract, an implied-in-fact contract must be based upon a meeting of the minds; however, the meeting of the minds is "inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Trauma Service Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996)); *United Pacific Insurance Company*, ASBCA No. 53051, 03-2 BCA ¶ 32,267 at 159,624, *aff'd*, 380 F.3d 1352 (Fed. Cir. 2004).

## II. ASCT Has Not Demonstrated the Existence of an Implied-In-Fact Contract

ASCT asserts that the implied-in-fact contract was created by its acceptance of an offer by the contracting officer, Mr. Boddie (app. br. at 15-21). Thus, we determine that the ASCT has satisfied the authority requirement. Similarly, ASCT's allegation that it maintained the materials on-site for use by the reprocurement contractor provides consideration (app. br. at 17-18). The government appears to concede that there was consideration for an implied-in-fact contract for the storage of ASCT's

materials, but not for a contract to purchase the materials (gov't resp. br. at 31).[6] This leaves mutuality of intent to contract, and unambiguous offer and acceptance as the contract formation elements in dispute.

As noted in the findings of fact above, we hold that Mr. Boddie did not make a contractual offer at the February 14, 2013 meeting. Faced with conflicting statements regarding the February 14, 2013 meeting, we conclude the contemporaneous statements and actions of the parties to be of greater weight than the declarations submitted eight years after the fact. *See*, *e.g.*, *Intermark Managed Servs.*, *Inc.*, ASBCA Nos. 57654, 57655, 12-2 BCA ¶ 35,091 at 172,344 (quoting *Fincke v. United States*, 675 F.2d 289, 295 (Ct. Cl. 1982)). First, we look to the February 25, 2013 meeting summary email. Both Mr. Boddie and Mr. Azimi testified that the summary was consistent with the statements at the meeting (tr. 49-50, 95-96, 195-96).[7] The email provides that "USACE has procedures that it *can use* to pay you for those materials so that they can be used to finish building the project. Please contact me if you are interested in selling those materials to USACE" (R4, tab 8 at 2) (emphasis added). The language of the email provides that the government *can use* its procedures and that the subcontractors should contact Mr. Boddie if they were interested in selling the materials. We do not interpret the email as making a binding offer to the subcontractors, rather Mr. Boddie invited expressions of interest in selling materials. This interpretation is consistent with the other contemporaneous statements in the record, and is consistent with Mr. Azimi's testimony that he understood that there were other steps that would need to be taken to reach an agreement with the government for the sale of the material (tr. 106-11). Thus, we hold that ASCT has not established the existence of an implied-in-fact contract for the sale or storage of its materials or equipment.

The subsequent communications between the parties are also insufficient to demonstrate the existence of an implied-in-fact contract. ASCT's March 14, 2013 response to the contracting officer stated that "as we owe most of the suppliers now for the procured materials, it would be of our mutual benefit to sell you our procured materials for your future plans. And [it] would be our pleasure to know how long will it take for the process, and what you would require us to send you" (R4, tab 9 at 3-4). Even allowing for a non-native English speaker, who might use more formal and less forceful language than a native English speaker, the email is clearly an inquiry as to whether the government would be interested in purchasing ASCT's supplies, rather than an email seeking to confirm the details of an existing agreement.

---

[6] The government's brief does not challenge the existence of an implied-in-fact contract for ASCT's storage costs for February through November 2013 as found in the final decision.

[7] As both witnesses testified to the accuracy of the February 25, 2013 email as a summary of the February 14, 2013 meeting, we do not find the issue of the possibly missing audio recording to be relevant.

12

Similarly, ASCT's March 25, 2013 email was an inquiry as to whether the USACE would purchase the material, rather than an email seeking to confirm an existing deal. Admittedly, the email starts with the statement that: "[a]s was requested from your side by email, and agreed in the meeting, it was stated that the procured material for this project that are not billed to ACI will be paid by USACE" (*id.* at 1). However, the email continues with the statement that: "neither a positive nor negative response have been clarified from your side for the procurements payment and processing" followed by a request that the USACE "please let us know, if these materials will be procured by USACE and paid to us or not?" (*id.*). At best, the email can be read as saying, "I thought we had a deal, but you haven't responded, please let me know." Unfortunately for ASCT, a statement that "I thought we had a deal" does not demonstrate a tacit understanding between the parties. *Trauma Service Group*, 104 F.3d at 1326.

ASCT additionally cites to the government's June 26, 2013 presentation to ACI's former subcontractors as an offer by the government to purchase its materials (app. br. at 23). However, the statements at the June 26, 2013 are, if anything, more clearly conditional than the earlier statements. After informing the subcontractors of a reduction in the scope of the project the government informed the subcontractors that "there is an opportunity for the subcontractors to have the materials they purchased for the original contract be used in the new contract" and requesting information from the subcontractors (R4, tab 11 at 1). The presentation additionally informed the subcontractors that they could remove their material from the site after demonstrating ownership (*id.*). The government's statement that there was an "opportunity" cannot be read as a binding offer.

In November and December 2013, ASCT emailed Navy Commander Jensen alleging that it had not removed its materials, and had incurred security and warehousing expenses based on the government's promise to procure the materials (R4, tab 14 at 1-4). But here, the e-mails read as if ASCT is alleging that the government failed to take a contemplated future action, not that that the government had agreed back in February to enter into a contract. The same is true with regard to the communications between ASCT's then counsel, Sher Saeedi, and Lieutenant Colonel Gary Davis, the District Chief of Contacting, in May 2014, where Mr. Saeedi indicated that ASCT wanted to "resolve this issue in an amicable way" (R4, tab 16 at 4) and that ASCT had been "left in a limbo by USACE with assurances of purchase of the goods at the site" (*id.*).

In April 2017, after ASCT sued ACI in Delaware state court, and settled that action, ASCT's then attorney contacted the government stating that "I am writing to gauge the Corps' interest in purchasing the materials ASCT maintains on the project site and to reimburse ASCT for expenses related to maintaining and securing the materials for the past several years" (R4, tab 32 at 1). In June of that year, ASCT's counsel again contacted the government, writing "[m]y client would like to know if the

USACE intends to negotiate a resolution to this matter or not" (R4, tab 17 at 1). Once again, these communications, predating ASCT's claim, can only be read as seeking a contract for the sale of the materials, and not as support for the existence of a meeting of the minds.

Moreover, the government's contemporaneous statements can only be read as conditional statements that something "could" happen. Statements of future intent do not constitute an offer. *See*, *e.g.*, *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001); *Frazier v. American Airlines, Inc.*, 434 F. Supp. 2d 279, 286-87 (D. Del. 2006), *aff'd,* 229 F. App'x 171 (3d Cir. 2007) (nonprecedential). The March 20, 2013, email from a government representative to Mr. Abdul Mateen Azimi, ASCT's Vice-President, provided that he did not "know how long the process will take," that it was "for the contracting officer to take action on," and that the government would "eventually (I think) process the stored materials for payment but the Contracting Officer is running the show." (R4, tab 9 at 2) Additionally, the June 26, 2013, presentation to the former ACI subcontractors informed them that "there is an opportunity for the subcontractors to have the materials they purchased for the original contract be used in the new contract . . . To take advantage of the opportunity, former ACI subcontractors must provide the contracting officer with documentation that proves that materials were purchased for the ACI prime contract, and not paid for by ACI … USACE needs copies of invoices . . . . If materials are still on site, USACE also needs photographs showing the quantity of materials and their current location" (R4, tab 11 at 1). Once again, the presentation uses conditional language about this being an opportunity and not does not state that the government had already agreed to purchase the material. The presentation also provided that "[i]f a former ACI subcontractor wants to remove the company's materials from the RPTC site, the company has to provide acceptable proof of ownership, and then USACE will make arrangements to give the company access to the site to remove the materials" (*id.*). This statement is contrary to ASCT's assertion that it was directed to maintain its material on site and that the direction was never revoked. ASCT understood that if it wanted to remove its materials from the project it was free to do so as long as it could prove its ownership to the materials (tr. 113).

Additionally, we note that ASCT's April 10, 2017 communication "writing to gauge the Corps' interest in purchasing the materials ASCT maintains on the project site and to reimburse ASCT for expenses related to maintaining and securing the materials for the past several years" (R4, tab 32 at 1) is inconsistent with ASCT's current position that an implied-in-fact contract was created in 2013. ASCT attempts to downplay the communication as an attempt by its prior attorney to "nudge" the government into honoring its prior commitment (app. reply at 11). However, the communication makes no reference to an existing contract as would be expected if ASCT believed that such a contract already existed. As we have already determined that the 2013 communications did not create an offer by the government, we interpret

14

this 2017 communication as being consistent with our holding that there was not an implied-in-fact contract created in 2013.

ASCT argues that offer, acceptance, and mutuality of intent to contract is demonstrated through its performance. According to ASCT, the fact that it secured its material and kept the material on site is evidence of acceptance by performance. (App. br. at 16-17). ASCT asserts that its actions evidence the existence of the contract because, without an agreement, it would have removed its materials and sold the materials to others (*id.* at 18). However, ASCT also makes the conflicting argument that the materials were made to specification for the police station and "would have been very difficult to sell" (*id.* at 18-19). If the material would be "very difficult to sell" ASCT's decision to leave the materials on site is more likely evidence of ASCT's hope of a possible sale to the government, than evidence of performance of an implied-in-fact contact.

ASCT additionally speculates that the government was "under great pressure to make a binding offer" to get the subcontractors back to work (app. br. at 19). ASCT cites no evidence for this "great pressure" and we do not deem it sufficient to support a finding of mutual intent to contract. Similarly, ASCT's speculation that "it is reasonable to assume the Army had to offer to pay outstanding expenses" (app. reply at 15) is not evidence that scope of the purported implied-in-fact contract included off-site materials and equipment.

The government relies upon our holding in *Intellicheck, Inc.*, ASBCA No. 61709, 21-1 BCA ¶ 37,892 for the proposition that simply maintaining the status quo with respect to the property is not conduct consistent with the existence of an implied-in-fact contract (gov't resp. br. at 30-31). In *Intellicheck* the appellant was a subcontractor on a multiple award contract with the Navy. As part of its performance, Intellicheck had possession of certain government property that was to be returned to the Navy at completion of the task order. In September 2013, the prime contractor filed a claim related to additional labor costs. The matter was appealed to this Board in March 2014, and was settled in August 2014. However, Intellicheck had not received instructions for the return of the property, and did not release the last of the property to the Navy until the end of December 2015. *Intellicheck*, 21-1 BCA ¶ 37,892 at 184,029. Intellicheck subsequently submitted a claim asserting an implied-in-fact contract for its costs of storing and maintaining the Navy property. *Id.* at 184,029-30. The Board held that no implied-in-fact contract had been formed because Intellicheck had not demonstrated the existence of mutuality of intent, and an unambiguous offer and acceptance. "In order to establish mutuality of intent, appellant must show, by objective evidence, the existence of an offer and acceptance." *Id.* at 184,131 (citing *Guardian Safety & Supply LLC d/b/a Enviro Safety Products*, ASBCA No. 61932, 19-1 BCA ¶ 37,333 at 181,561 (in turn citing *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003))). "Once an

15

offer is made, 'acceptance of the offer [must] be manifested by conduct that indicates assent to the proposed bargain.'" *Id.* (citing *Guardian Safety & Supply*, 19-1 BCA ¶ 37,333 at 181,561 (in turn quoting *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237)).

*Intellicheck* differs from the appeal before us in several aspects; however, the holding is instructive. As explained above, we do not find the statements at the February 14, 2013 meeting, or in the February 25, 2013 email, to have constituted an offer. Thus, we reject ASCT's argument that it accepted the offer by performance. Rather, we hold that ASCT's communications with the government formed the offer. There is no evidence of conduct by the government that can objectively be seen as assenting to the implied-in-fact agreement. *Intellicheck*, 21-1 BCA ¶ 37,892 at 184,031; *Guardian Safety & Supply*, 19-1 BCA ¶37,333 at 181,561. Simply put, the government's inaction is not evidence of the formation of an implied-in-fact contract.

ASCT additionally cites as "evidence" of an implied-in-fact contract statements by the contracting officer in the final decision (app. reply at 8 ("The Government has already found that this communication was sufficient to create an implied-in-fact contract to pay ASCT to secure its materials on site when ASCT accepted the offer by continuing to pay the costs needed to store and secure the materials after February 25, 2013")). However, the contracting officer's final decision is reviewed by this Board *de novo*. *See* 41 U.S.C. § 7104(b)(4) (action brought before the Board proceeds *de novo*); *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (appeal to board or court from contracting officer's final decision is *de novo*). Thus, the statements of the contracting officer, in this appeal, an individual different from the contracting officer that made the February 2013 statements at issue, are not entitled to any deference. That said, the government has not requested that we overturn the contracting officer's final decision. Rather the government requests that the "contracting officer's final decision on this matter stand" (gov't resp. br. at 41). Thus, although we do not find the existence of an implied-in-fact contract for ASCT's storage costs from February through November 2013, we do not disturb the contracting officer's final decision.

ASCT also dismisses the lack of price discussions as irrelevant to the question of contract formation. While ASCT is correct that a failure to agree on a price does not undermine other evidence of mutual assent (app. reply at 9 (quoting *Gardiner*, *Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004))) here we determined that evidence of mutual assent is lacking. Once there is evidence of intent to contract, the price term can be supplied, but here there was no mutual intent to contract, and the lack of pricing discussions is further evidence that an implied-in-fact contract was not created.

Having determined that ASCT has not established the existence of an implied-in-fact contract, we need not reach ASCT's arguments regarding the inclusion of

equipment and off-site materials in the alleged contract (app. reply at 15-19), or ASCT's arguments interpreting its settlement agreement with ACI (app. reply at 13-15).

Having found that ASCT has not demonstrated the existence of an implied-in-fact contract, we hold that ASCT's other asserted bases for recovery are not properly before us, are beyond our jurisdiction, or both. ASCT asserts that the government breached its duty of good faith and fair dealing (app. br. at 35-40). However, ASCT did not present a breach of the duty of good faith and fair dealing in its claim to the contracting officer (R4, tab 3). Accordingly, we lack jurisdiction to entertain this allegation. *See*, *e.g*. *M. Maropakis Carpentry, Inc. v. United States,* 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir. 1996)). Even if we possessed jurisdiction to entertain the argument, it would fail because we held above that there was not an implied-in-fact contract between the USACE and ASCT. Without a contract, there can be no breach of the duty of good faith and fair dealing. *See*, *e.g*., *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (holding that the government "could not have breached the covenant of good faith and fair dealing by its pre-award conduct because the covenant did not exist until the contract was signed"); *Tug Hill Constr., Inc.*, ASBCA No. 57825, 14-1 BCA ¶ 35,777 at 175,024, *aff'd*, 622 F. App'x 914 (Fed. Cir. 2015) (nonprecedential).

To the extent that ASCT's complaint can be interpreted as asserting a Fifth Amendment taking of its property, or a claim for negligence in selecting the prime contractor, ASCT disclaimed these theories in our prior decision, and they need not be addressed here. *ASCT Group*, 20-1 BCA ¶ 37,540 at 182,289.

## CONCLUSION

For the reasons stated above, the appeal is denied. The contracting officer's final decision, dated October 31, 2018, and awarding appellant $78,936, subject to ASCT submitting a proper invoice, remains in effect.

Dated: April 26, 2022

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

17

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeal in ASBCA No. 61955, Appeal of ASCT Group, Inc., rendered in conformance with the Board's Charter.

Dated: April 27, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals